425 F.2d 1211
 Derek Jerome SINGLETON et al., Appellants,
v.
JACKSON MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Appellees.
Clarence ANTHONY et al., Appellants,
v.
MARSHALL COUNTY BOARD OF EDUCATION, Appellee.
Linda STOUT, by her father and next friend Blevin Stout, et
al., Plaintiffs-Appellants, United States of
America, Plaintiff-Intervenor,
v.
JEFFERSON COUNTY BOARD OF EDUCATION et al., Defendants-Appellees.
Doris Elaine BROWN et al., Plaintiffs-Appellants, United
States of America, Plaintiff-Intervenor,
v.
The BOARD OF EDUCATION OF the CITY OF BESSEMER et al.,
Defendants-Appellees.
Birdie Mae DAVIS et al., Plaintiffs-Appellants, United
States of America, Plaintiff-Intervenor,
v.
BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY et al.,
Defendants-Appellees, Twila Frazier et al.,
Defendants-Intervenor-Appellees.
Robert CARTER et al., Plaintiffs-Appellants,
v.
WEST FELICIANA PARISH SCHOOL BOARD et al.,
Defendants-Appellees, Sharon Lynne GEORGE et al.,
Plaintiffs-Appellants, v. C. Walter DAVIS, President East
Feliciana Parish School Board et al., Defendants-Appellees.
Irma J. SMITH et al., Plaintiffs-Appellants,
v.
CONCORDIA PARISH SCHOOL BOARD et al., Defendants-Appellees.
Neely BENNETT et al., Appellants,
v.
R. E. EVANS et al., Appellees, Allene Patricia Ann BENNETT,
a minor, by R. B. Bennett, her father and next
Friend, Appellants, v. BURKE COUNTY
BOARD OF EDUCATION et al., Appellees.
Shirley BIVINS et al., Plaintiffs-Appellants,
v.
BIBB COUNTY BOARD OF EDUCATION and Orphanage for Bibb County
et al., Defendants-Appellees.
Oscar C. THOMIE, Jr., et al., Plaintiffs-Appellants,
v.
HOUSTON COUNTY BOARD OF EDUCATION, Defendants-Appellees.
Jean Carolyn YOUNGBLOOD et al., Plaintiffs-Appellants,
United States of America, Plaintiff-Intervenor,
v.
The BOARD OF PUBLIC INSTRUCTION OF BAY COUNTY, FLORIDA et
al., Defendant-Appellees.
Lavon WRIGHT et al., Plaintiffs-Appellants,
v.
The BOARD OF PUBLIC INSTRUCTION OF ALACHUA COUNTY, FLORIDA,
et al., Defendants-Appellees.
 Nos. 26285, 28261, 28350, 28349, 28340, 28342, 28409, 28407,
28408, 27863, 27983.
 United States Court of Appeals, Fifth Circuit.
 Jan. 21, 1970.
 
 Reuben V. Anderson, Paul Brest, Iris Brest, Fred L. Banks, Jr., Marian E. Wright, Melvyn R. Leventhal, Jackson, Miss., Jack Greenberg, Franklin White, Melvyn Zarr, Norman J. Chachkin, Jonathan Shapiro, New York City, Robert Moore, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for appellants Derek Jerome Singleton and others.
 Robert C. Cannada, Thomas H. Watkins, Special Counsel, A. F. Summer, Atty. Gen., Dugas Shands, Asst. Atty. Gen., Jackson, Miss., for appellees Jackson Municipal Separate School District and others.
 Jerris Leonard, Asst. Atty. Gen., David L. Norman, Deputy Asst. Atty. Gen., John A. Blevans, David D. Gregory, Attys., U.S. Dept. of Justice, Washington, D.C., for the United States in all cases.
 Louis R. Lucas, Memphis, Tenn., John L. Maxey II, Holly Springs, Miss., Jack Greenberg, Norman Chachkin, New York City, for appellants Clarence Anthony and others.
 Semmes Luckett, Clarksdale, Miss., William A. Allain, Asst. Atty. Gen. of Mississippi, Jackson, Miss., for appellee Marshall County Board of Education.
 Brian K. Landsberg, David D. Gregory, Gary J. Greenberg, Attys., Civil Rights Div., Dept. of Justice, Washington, D.C., Richard B. Hardee, U.S. Atty., Tyler, Tex., for appellant the United States.
 Henry H. Harbour, John M. Smith, Longview, Tex., for appellees Charles F. Mathews and others.
 U. W. Clemon, Birmingham, Ala., Norman Amaker, New York City, David Hood, Bessemer, Ala., for plaintiffs-appellants Linda Stout and Doris Elaine Brown and others.
 Jerris Leonard, Asst. Atty. Gen., Frank Dunbaugh, Atty., U.S. Dept. of Justice, Washington, D.C., for plaintiff-intervenor the United States.
 Maurice Bishop, Reid Barnes, Birmingham, Ala., Macdonald Gallion, Atty. Gen., Montgomery, Ala., J. Howard McEniry, Jr., Bessemer, Ala., for defendants-appellees Jefferson County Board of Education, Board of Education of the City of Bessemer and others.
 
 
 1
 Vernon Z. Crawford, Mobile, Ala., Jack Greenberg, Michael Davidson, New York City, for plaintiffs-appellants Birdie Mae Davis and others.
 
 
 2
 Abram L. Philips, Jr., James D. Brooks, Pierre Pelham, Mobile, Ala., for defendants-appellees Board of School Commissioners of Mobile County and others.
 
 
 3
 Other Interested Parties: Charles S. White-Spunner, Jr., U.S. Atty., Mobile, Ala., Frank M. Dunbaugh, Walter Gorman, Attys., Dept. of Justice, Washington, D.C., Charles Morgan, Jr., Atlanta, Ga., for plaintiff-intervenor the United States.
 
 
 4
 Richard B. Sobol, George M. Strickler, Jr., Robert P. Roberts, Collins, Douglas & Elie, New Orleans, La., Murphy W. Bell, Baton Rouge, La., for plaintiffs-appellants Robert Carter and Sharon Lynne George and others.
 
 
 5
 John F. Ward, Jr., Baton Rouge, La., Richard H. Kilbourne, Dist. Atty., Clinton, La., Fred C. Jackson, Asst. Dist. Atty., St. Francisville, La., Kenneth C. Dejean, Atty. Gen's. Office, Harry J. Kron, Jr., Asst. Atty. Gen., Baton Rouge, La., for defendants-appellees West Feliciana Parish School Board and C. Walter Davis and others.
 
 
 6
 George M. Strickler, Jr., Collins, Douglas & Elie, New Orleans, La., Richard B. Sobol, Jesse H. Queen, Brian K. Landsberg, Dept. of Justice, Civil Rights Div., Washington, D.C., for plaintiffs-appellants Irma J. Smith and others.
 
 
 7
 Kermit M. Simmons, Winnfield, La., W. C. Falkenheiner, Dist. Atty., Vidalia, La., Harry J. Kron, Jr., Thibodaux, La., for defendants-appellees Concordia Parish School Board and others.
 
 
 8
 Melvin P. Barre, Dist. Atty., Edgard, La., Harry J. Kron, Jr., Dist. Atty., Thibodaux, La., Jack P. F. Gremillion, Atty. Gen. of Louisiana, Baton Rouge, La., for plaintiffs-appellants-cross-appellees Hemon Harris and others.
 
 
 9
 Benjamin E. Smith, A. P. Tureaud, New Orleans, La., or defendants-appellees-cross-appellants St. John the Baptist Parish School Board and others.
 
 
 10
 John H. Ruffin, Jr., Augusta, Ga., Jack Greenberg, New York City, for appellants Neely Bennett and Allene Patricia Ann Bennett and others.
 
 
 11
 W. M. Fulcher, Augusta, Ga., for appellees R. E. Evans and Burke County Board of Education and others.
 
 
 12
 Norman Chachkin, Jack Greenberg, New York City, Thomas M. Jackson, Macon, Ga., for plaintiff-appellants Shirley Bivins, Oscar C. Thomie, Jr. and others.
 
 
 13
 Frank C. Jones, Wallace Miller, Jr., Macon, Ga., for defendants-appellees Bibb County Board of Education and Orphanage for Bibb County and others.
 
 
 14
 J. Harold Flannery, Atty., Dept. of Justice, Civil Rights Div., Washington, D.C., for the United States.
 
 
 15
 D. P. Hulbert, Perry, Ga., for defendant-appellee Houston County Board of Education.
 
 
 16
 Theodore R. Bowers, Panama City, Fla., Jack Greenberg, William L. Robinson, New York City, Drew S. Days, III, for plaintiffs-appellants Jean Carolyn Youngblood and others.
 
 
 17
 Julian Bennett, Panama City, Fla., for defendants-appellees The Board of Public Instruction of Bay County, Fla. and others.
 
 
 18
 D. Battle Rankin, J. Harold Flannery, Attys., Dept of Justice, Civil Rights Div., Washington, D.C., for plaintiff-intervenor, the United States.
 
 
 19
 Earl M. Johnson, Reese Marshall, Jacksonville, Fla., Jack Greenberg, William L. Robinson, James M. Nabrit, III, Norman J. Chachkin, New York City, for plaintiffs-appellants Lavon Wright and others.
 
 
 20
 Harry C. Duncan, Gainesville, Fla., for defendants-appellees, the Board of Public Instruction of Alachua County, Fla. and others.
 
 
 21
 Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CARSWELL, CLARK and INGRAHAM, Circuit Judges, En Banc.[1]
 
 PER CURIAM:
 
 22
 The judgment of the Supreme Court in Carter v. West Feliciana Parish et al., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477, Nos. 944 and 972, opinion dated January 14, 1970, reversing the judgment of this court in the within matters rendered sub nom. Singleton v. Jackson Municipal Separate School District et al., 419 F.2d 1211, No. 26285, et al., opinion dated December 1, 1969, with respect to the deferral of student desegregation beyond February 1, 1970 is made the judgment of this court. All other provisions of the order of this court in Singleton shall remain of full force and effect. The mandate of this court shall issue forthwith.
 
 
 23
 This order is issued subject to the right of any member of the court to file a separate opinion.
 
 
 24
 COLEMAN, Circuit Judge (concurring in part and dissenting in part).
 
 
 25
 I agree, of course, that this Court must comply with any mandate of the Supreme Court of the United States. We unanimously expressed our best judgment that racial discrimination could more effectively be eradicated, with less permanent damage to the educational process, by deferring transfers within the student bodies of these schools until September 1, 1970. The Supreme Court disagreed; we have been reversed.
 
 
 26
 With deference, this does not mean that I agree with the action of the High Tribunal. My vote on December 1, 1969, indicates that I do not. I fear that thousands of school children, black and white, who cannot help themselves, will be the victims. The ultimate outcome will be exactly the opposite of that intended.
 
 
 27
 I agree, too, that the cases should be remanded to the District Courts for full implementation of what the Supreme Court has required. In doing this, we are simply following what the Court held in Brown II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. The Court there said, 'Because of their proximity to local conditions and the possible need for future hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts', 349 U.S. 299, 75 S.Ct. 756. We cannot, we should not, shear the District Courts of their original jurisdiction and of the duties, responsibilities, and powers which inherently and by statute accompany their jurisdiction.
 
 
 28
 Therefore, I agree with the remand to the District Courts.
 
 
 29
 What I dissent from is the continuing failure of this Court to provide a lighthouse in the new storm which is upon us. The school authorities and the District Judges need something to steer by.
 
 
 30
 In United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836, 380 F.2d 385 (1966 and 1967), when freedom of choice was an acceptable method of seeking desegregation, this Court formulated a detailed decree for use by the District Courts and forbade any variation therefrom. Now that freedom of choice is held to have generally failed we lapse into silence and wash our hands in the water of taciturnity. I strongly protest this approach. In Jefferson I, 372 F.2d 836, 849 (1966), the majority announced, 'We grasp the nettle'. Are we continuing to grasp it? I think the District Courts need help. They are being forced to act without our answer to many unanswered questions. I shall discuss some of them and state my view of what the answers ought to be.
 
 
 31
 On September 30, 1969, at an en banc session in New Orleans, this Court ordered the cases now before us to be considered en banc. We were acutely aware of the critical nature of the problem-- critical for the eradication of unconstitutional discrimination and critical for the future of public education, the great hope of nearly all children, black and white. It was my understanding then that upon the en banc hearing in Houston on November 17, 1969, we would attempt to supply some judicial compasses for use in a forest which had not been anticipated in 1966. Regrettably, we did not really do so.
 
 
 32
 Certainly, as the Supreme Court said in Brown II, and as we have often repeated, local school authorities have the primary responsibility for elucidating, assessing, and solving these problems, 349 U.S. 299, 75 S.Ct. 753. It does no good now to say that these school districts have had fifteen years in which to do something and have not done it. As a matter of fact, most of the school districts now before us, if not all of them, have been under the supervision of the federal courts for as much as five years. I think it is quite clear what this proves.
 
 
 33
 Regardless of who is, or has been, at fault, the Supreme Court has told us in no uncertain terms that it will brook no further delays. Do we, then, stand by and see innumerable schools go crashing on the rocks and educational processes seriously impaired or shall we bestir ourselves and advance judicial solutions which will dismantle the dual school system without dismantling the schools as well? Samson slew his enemies, all right, but he likewise destroyed the hall and liquidated himself-- all because of bad judgment, previously exercised.
 
 
 34
 Of course, the prior decisions of the Supreme Court and of this Court are as available to the District Judges as they are to us and they are undoubtedly as capable of reading them as we are. The District Courts have a right to fill in the blind spots, consistently with the judicial oaths which they are certain to observe. Only this morning I read in the press that one District Judge has exercised his judicial discretion but another stated that he had been shorn of the power to act as anything but a funnel. This points up the tragedy of our failure to provide a torch.
 
 In Brown II the Supreme Court said:
 
 35
 'In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power', (349 U.S. 300, 75 S.Ct. 756.)
 
 
 36
 Certainly, racial segregation or discrimination imposed or permitted by state action cannot hide behind any equitable claim, but I think the language means what it so clearly says: that Judges are not to be the prisoners of anybody's plan or formula. They are to function as Courts ought to function-- consider all available evidence and then dismantle the dual system by that method which is most likely to attain Constitutional results with the least possible damage to the educational needs of the children of all races, creeds, or colors.
 
 
 37
 The Supreme Court proffered additional guidance in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.
 
 
 38
 The Court said of the New Kent County Schools, 391 U.S. 435, 88 S.Ct. 1693:
 
 
 39
 'Racial identification of the system's schools was complete, extending not just to the composition of the student bodies at the two schools but to every facet of school operations-- faculty, staff, transportation, extracurricular activities and facilities. In short, the State, acting through the local school board and school officials, organized and operated a dual system, part 'white' and part 'Negro'. It was such dual systems that 14 years ago Brown I held unconstitutional and a year later Brown II held must be abolished.'
 
 
 40
 These words were deliberately used, of course, I think they tell us what a dual system really is, but this Court has never described or defined what constitutes a dual system. Neither have we described or defined, within reasonable limits, the meaning of a 'unitary' system. How are the struggling school authorities to know at what point they shall have succeeded in dismantling a dual system or setting up a unitary system? I suggest that we take a good, long look at the language in Green and see if we do not clearly get the message.
 
 
 41
 It is high time for us to elaborate upon what the Supreme Court told us in Alexander v. Holmes County Board of Education,
 
 
 42
 'That each of the school districts here involved may no longer operate a dual school system based on race or color, and directing that they begin immediately to operate as unitary school systems within which no person is to be effectively excluded from any school because of race or color,' 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19.
 
 
 43
 What did the Supreme Court in Green say that we should do to eliminate the complete racial identification of a school system which is divided into two separate parts, right down to faculty, staff, transportation, extra curricular activities, and facilities (five criteria)?
 
 
 44
 'The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method. Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed. See Raney v. Board of Education of Guild School district, 391 U.S. 443, at 449, 88 S.Ct. 1697, at 1700, 20 L.Ed.2d 727.
 
 
 45
 'We do not hold that 'freedom of choice' can have no place in such a plan. We do not hold that a 'freedom-of-choice' plan might of itself be unconstitutional, although that argument has been urged upon us. Rather, all we decide today is that in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself.'
 
 
 46
 'On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, non-racial school system, 'freedom of choice' must be held unacceptable.' (391 U.S. 439, 441, 88 S.Ct. 1695-1696).
 
 
 47
 The High Court has never arbitrarily commanded that there must be racial balance in the student body of any school purely for the sake of racial balance. It has never commanded that little children be required to walk unreasonable distances, or be bussed to strange communities just to obtain racial balance. It has ordered us to quit operating two systems within a system, one all black and one all white, judged by five criteria, not one. Neither has it left the door open to tokenism.
 
 
 48
 I think the Supreme Court expected us to know how, within reason, to get the job done without material injury to true educational objectives and without, like Samson, pulling down the halls we exist to preserve.
 
 
 49
 I respectfully suggest for the consideration of the District Judges that they carefully reassure themselves of what the Supreme Court has really said, as well as what it has not commanded by way of administrative detail. Segregation by state action or state permission has been legally a corpse for fifteen years. It has to be buried. I, for one, think there are many ways by which this can be accomplished without burying the public schools in the same grave through the use of unreasonable and educationally unsound requirements for both black and white. There are many ways it can reasonably be done in keeping with the personal dignity of all citizens, of whatever race.
 
 
 50
 In its en banc Jefferson decision, 380 F.2d at 389, a majority of this Court said:
 
 
 51
 'The Court holds that boards and officials administering public schools in this Circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools-- just schools.'
 
 
 52
 Our Court has never said what this really means. In the light of Green, we ought to say. A school is more than just an attendance center-- a house. It is faculty, staff, transportation, extracurricular activities, and facilities. What, then, is an ALL BLACK school? What, then is an ALL WHITE school? The plans being put into effect in this Circuit say that only racial balance, to the exclusion of all other considerations, will avoid either alternative. I submit that this is not the law and the Supreme Court has not so commanded. Neither have we. The District Courts ought to remember this.
 
 
 53
 In anticipation of the professional skeptic, black or white, who has done more to destroy the public school systems of the South than any other factor, let me make it clear that this opinion is no subtle invitation for the impossible goal of continued segregation by state action. It is a plea that we save our Constitutional rights and our schools at the same time. To do anything else is to defeat both objectives.
 
 
 54
 With deference to my fellow Judges, for whom I have the greatest respect, I would have much preferred that an opinion of this kind should have come from the Court rather than the separate opinion of one Judge. It no doubt would have been a much better effort and of immensely more weight.
 
 
 55
 This writer is from a State which must have an effective public school system if, in the long run, it is to survive. From 1950 to 1956 he served as one member of a three member State Board of Education. It is hoped that the intensity of his desire to preserve the public school system in a Constitutional manner will not be misunderstood.
 
 
 56
 To the extent indicated I respectfully dissent.
 
 
 57
 CLARK, Circuit Judge, concurs in this dissenting opinion.
 
 CLARK, Circuit Judge (dissenting).[1]
 
 58
 Only the strongest belief that the remedy imposed by today's action violates basic constitutional rights of most of those upon whom it is fastened could induce me as a brand new judge to set forth these comments. In form we here simply enforce a Supreme Court mandate so the reasons for this writing may turn out to be small in the overall context of things, but they now appear to be of the largest dimensions. The very substance of my oath forbids my allowing this order to issue in the form it does with my silent acquiescence when I so deeply feel it is fundamentally and constitutionally unsound. I am therefore compelled to assert my most respectful disagreement with what we have done.
 
 
 59
 There are two constitutional dimensions to the error:
 
 
 60
 (1) Our action does not confer equal protection. It destroys for all the very protection it seeks to make equal.
 
 
 61
 (2) The precipitate haste with which vague, undefined action is required by the parties deprives them, and any others that may be affected by what we here do, of that due process of law we are sworn to vouchsafe.
 
 
 62
 Of all the tasks to which we have been set as judges, certainly this action is the most sensitive for we deal with the central lives of literally hundreds of thousands of children, parents, teachers and others, each one of whom has a most important right to be heard and to be equally protected in his or her constitutional rights as an individual person. If ever there was a time for the court to bend every effort to be credible and persuasive to those affected by our order, it is now. The central aim of courts is to solve problems-- not create them. The brief order we here use to enforce the mandate lacks even the smallest spark of compassionate understanding. It is justified neither with reason nor logic, nor is it supported by the slightest attempt at persuasion. We do not show the District Court or the litigants how to get this case out of the courts. We do not point out where the new concept of mid-term student body merger has been applied with success. We do not demonstrate the shortcomings or defects of other more reasonable options available. We simply issue another cryptic edict. To me it is as starkly simply as the bare bones of this order that we must secure popular acceptance for what we here decree if it is ever to become truly effective.[2] This is put forth without in the slightest way advocating that we become a populist court. My concern is not with the popularity of the court's orders, but with the function of such orders in a way that has some chance to bring about the result intended. We are not dealing with the establishment of any principles of law. If we were, explanation could be unnecessary. But no one is here before us seeking to resurrect segregation in public education. That corpse is buried and the funeral is over for all but a vocal few extremists, both black and white. Rather, we have the task of fashioning a remedy that will secure the form of equal protection that has been adjudged for all members of the class before us.[3]
 
 
 63
 The remedy we hope to achieve is one fraught with great difficulty because our nation is a nation of free people. So long as they don't violate some duty imposed by law they can live their lives as they please, making much of themselves or nothing, going there or staying here.[4] When this freedom of action is set opposite the thrust of the problem to be solved the difficulty becomes most apparent. The headstone used in constructing the arch of change from separate but equal to unitary public education was the feeling of inferiority said to be engendered in members of the Negro race by enforced racial segregation in public schools.[5] If our remedy is unreasoned and so abrupt that the non-Negro community exercises its freedom and withdraws its participation in and support for a public school or a public school system, then in the end we have remedied nothing in that school or district. This is not specious speculation. It is happening at this very moment in districts before us today.
 
 
 64
 We should now be striving with our best lights and powers of reason and persausion to appeal to that insight, instinct and nobility that lies in the hearts of all the people. Instead of a 'Do as I say' pronouncement, we should be not only reasoned and articulate, but also specific as to what those we direct be enjoined must do in order to comply. We here command the district courts to enjoin upon school districts such a vague standard by which to conduct their affairs that I seriously doubt that we would let it stand if it were appealed to us at trial court action. Surely, possessing the power to enjoin, all recognize that we have a corresponding duty to make our injunction order crystal clear.[6]
 
 
 65
 In the beginning we tell everyone what the Supreme Court told us-- that they must achieve the results we order 'immediately',[7] Then we tell no one what we mean. 'Turn off the light immediately.' means one interval of time if it is directed to a man standing by the light switch. It means an interval many times longer when the same words are addressed to one who must enter a locked house and climb the stairs to reach the switch. There is yet another and a completely different time meaning to the word when it is used to command a man with a shovel to move a mountain. Here we deal with the complicated task of simultaneous and complete reorganization of student bodies and teachers. But some measurable period of time is necessarily involved. Is it 'Eight weeks'? 'Minimum time necessary'? 'Not later than February 1, 1970'?[8] If the latter, what happens after the February 1, 1970 date arrives? Must the entire school district close down until the court adjudges it to be in compliance? We should answer these questions. That our answer might be less than precise is no reason we should not try to make our position apparent. I think we ought to tell the district courts that the sense of what we were told translates to them in this form: The matter is committed to their sound discretion, with the expectation that they will proceed as rapidly as minimum disruption of the school district will permit. We should make it plain that doing an effective and lasting job is more vital than total instantaneous chaos to meet an artificial deadline. We ought to act now to keep the spirit of what was ordered alive after the time fixed by the letter of it has died on the clock.
 
 
 66
 Nobody knows what constitutes '(a unitary school system) within which no person is to be effectively excluded from any school because of race or color.'[9] This is not to say that this court hasn't drawn some negative limits around the phrase 'unitary school.' We have frequently decreed that systems coming before us were not unitary for one reason or another.[10] However, what is here urged is our duty to speak affirmatively, to tell the litigants, in advance of attacks made on them, precisely what such a 'unitary system' is. We have said such a system must be racially integrated.[11] and that its faculty must approximate the racial balance of the whole system.[12] These are the only affirmatives known.
 
 
 67
 The assignment of specific racial quotas and the establishment of minimum, acceptable, percentage, racial guidelines for students, most assuredly cannot be the terms of definition, for when a child of any race wishes to attend a school because of its location close to home, because of the deemed excellence of its faculty of facilities, because it is attended by brothers or sisters or close friends or because it is on Dad's way to work or in Mother's car pool, and his wishes accord with valid educational policy, yet that child winds up being excluded from that school solely because the color of his or her skin doesn't conform to a predetermined arbitrary racial quota or percentage guideline, that child's right to be free of racial distinctions is gone.12A By the very wording of the phrase to be defined, a school system can't be 'unitary' if a child is effectively excluded from any school because of his or her race or color. It's easy to see what it isn't, the challenge is to show what it is.
 
 
 68
 We speak no plainer when we say that the test to be applied to any 'unitary school' plan is whether 'it works' because we haven't ever said what that means. We have stated,[13] as has the Supreme Court,[14] that a unitary system is one 'without white schools or Negro schools-- just schools.' That's no answer either. When is a school 'white'? When is it 'Negro'? When does it ever get to be 'just' a school? One thing is sure-- what we do here today has the greatest possible potential for creation of all-black school systems within many of the counties and parishes before us.
 
 
 69
 We really act empirically in this situation. There is no science to what we do.[15]
 
 
 70
 With proper limits for teacher integration and the use of school facilities on a non-racial basis, the presently rejected tool of freedom of choice has the greatest possible chance of any system yet devised for achieving a lasting solution to de jure school segregation problems in most districts before us here.[16] Our attempts to make to only with present artificial methods will continue to bring us to new grief. Courts should not be so impatient with immediate results, especially until freedom of choice has been tried with increased teacher integration and with active community and school district support. It would not be in the least a regression to now reaffirm the permissible use of this tool as a viable part of a plan now. I say this in full recognition of the fact that we may have to go the full circle on the present merry-go-round before this view is accepted. Only one more comment-- I can see no wrongful shift of burden involved in freedom of choice. The choice is ultimately that of the student and his parent. The school district can only make it more or less attractive with particular zones or pairs. Each child has his or her unique problems that only child and parent can fit into this delicate equation.
 
 
 71
 There is another duty we have placed on school districts which is entwined with establishing 'unitary' schools and which equally cries out for a plain definition from us. In its latest phrasing, it requires that districts 'extirpate any lingering vestiges of a constitutionally prohibited dual school system,' and disestablish 'all aspects of a segregated public school system.'[17] Why doesn't this court explicitly set forth now each and every one of these 'vestiges' and 'aspects' so that district courts and school district officials can know what to do and can know when they have been successful in complying with our orders? Such a listing would not only hasten the elimination of such 'vestiges' and 'aspects', but doubtless will have the salutary effect of increasing respect for law by showing all who would see that we intend to make our order operate evenly and that we do not intend any ex post facto treatment of districts because their performance might not suit some judges' individual fancies.7A
 
 
 72
 The court seeks to bring mighty things to pass, but just how is not explained. For, unless it somehow imprisons the present and future school children in each district, it cannot say to them, 'I have no need of you.' This is what it's all about. The court needs the willing cooperation of people to make its relief effective. My main problem is that the court in nowise seeks to gain that cooperation by making its decree reasoned and precise enough to be accepted and understood. It is time for us to stop vetoing the efforts of the public officials charged with the actual day to day process of education.
 
 
 73
 All of what we do here is based upon granting equal protection to citizens. When the claim, bright light of history illuminates what has been done, it is bound to show that too great a haste for 'equal' played a major part in destroying the protection we sought to provide. Certainly the court doesn't make today's decree because it got mad at the school district litigants when they were found to be circumstanced as they are. It's also implausible that the hasty action, taken without any real semblance of the usual briefing and argument, could be predicated on a feeling 'We have these people on the run-- don't let them catch their breath.' But I am bold to ask, what is the theme to which this tune is set? For it cannot be rightly said that the blame for the lack of all deliberate speed belongs upon the school children of either race or upon their parents, yet it is they who are being equally punished by being deprived of one of the most vital and fundamental of the protections encompassed by the Fourteenth Amendment-- a viable public education. For some of these children it is their last year in school. For all of them it's their most important. Reorganization of their districts in mid-year not only separates them from their friends and classmates, destroys their close identify with their school, interrupts months of training in difficult subjects with teachers they understand and to whom they respond; it also drains their districts of already thin financial resources and sends them packing across town or across the county or parish to strange environs with new classmates, new teachers, possibly to a different curriculum, with different or no equipment.
 
 
 74
 Subtantially exact racial balance of faculties stands in our order as a requirement by February 1, 1970.[18] Many districts were embarked on compliance when the interim edict went forth to prepare for student merger simultaneously. This brought everything then in progress to a halt. Until students were reassigned and the numbers involved and the children were actually identified as to curriculum needs in each particular school, how could teachers be assigned? Now each district is faced with the probability that teachers will have to be reassigned, not once, but several times. With contracts expiring in early June there's no way to send the children home 'til all settles down. Perhaps a few teams of qualified computer technicians with enough equipment could work it out, but we leave no time for even that exotic remedy. If this school year can be salvaged, it will be nothing short of a miracle and not in the least attributable to our actions. How this can qualify as any form of protection is indeed an enigma wrapped in a mystery.
 
 
 75
 I am not the first judge to observe that courts have perpetuated errors by repeating them without pause for examination.[19] One such fable is the argument that any school districts which don't now comply with this court's new guidelines have been in violation of court orders for 16 years and are therefore not deserving of additional consideration. The error of this is in two parts:
 
 
 76
 First, as to the existence of any past violation; second, as to the appropriate remedy if the first had been so.
 
 
 77
 Courts of the United States are given jurisdiction by the Constitution to determine cases and controversies; they are not possessed of any power to enact legislation; their decisions are binding upon the parties before them-- not upon the nation at large. In a number of fields-- such as those involving commercial transactions or real estate, where consistency of the law is vital, the principle of binding precedent or stare decisis is applied.[20] By this principle, those who find themselves similarly situated to litigants in a prior case may expect the same principle to be applied to decide their actions. Such principles are but rarely modified. However, state decisis has never been strictly applicable in the field of constitutional law.[21] Only a moment's reflection shows the necessity for such a rule. If it were otherwise, the prejudices of individuals who occupy judicial office could be erected into constitutional principles and the court, not the document upon which our republic is based, would be in control of our destiny. Indeed, if stare decisis were strictly applicable in constitutional law the doctrine of separate but equal public facilities for racial groups which was the court declared guideline for over 75 years, would still be in force.[22]
 
 
 78
 Since stare decisis is not strictly applied, litigants cannot be nearly so sure as to what precedent might govern their case. Correspondingly, they have a wider latitude within which to justify the relitigation of constitutional principles established in prior cases. This is necessary to assure them that their basic rights and privileges are not wrongfully forfeited on the mere assumption that the court's decision as to their case will not change.
 
 
 79
 Within the period of sixteen years from the Brown decisions[23] to the present, the courts have evolved a number of procedures to accomplish transition from dual to unitary systems of public education. In recent years this circuit has striven to maintain a maximum of uniformity of treatment with this change. For this reason, in most of the cases involved in the consolidated appeal at bar the school boards have until most recently operated under the terms of a mandatory injunction requiring them to utilize freedom of choice plans fashioned upon our Jefferson model decree.[24] This was not the beginning of concepts foreign to present thinking. Whether based on decision or dicta or independent reasoning, prior decisions of this circuit expressly overruled in Jefferson[25] established as the law of this circuit that the Fourteenth Amendment forbade segregation but did not command integration. This 1967 change of position in Jefferson was the first announcement that Fifth Circuit school boards had the duty to achieve affirmative racial integration of school systems. Even then the court eschewed the setting of racial quotas or the striking of any precise Negro/white balances. Bussing was not required and neighborhood schools were not condemned. Guidelines prepared by the Office of Education of the Department of Health, Education and Welfare were to be given 'great weight' but it was made clear that the court was to make the decree. The Jefferson relief, even in the original December panel decision, was to commence at the beginning of the following school year.[26] In June 1968 Jefferson County was again before the court regarding standards of faculty integration and the court gave the school districts two school terms to achieve satisfactorily integrated faculties without specifying any number or quota and without dealing with student integration at all.[27] In May 1968 the Supreme Court affirmed that there was no universal answer to school desegregation, that no one plan could be expected to do the job in every case and that every plan had to be assessed after a period of evaluation in practice.
 
 
 80
 What the court now turns off as a long standing school district wrong of failing to achieve satisfactory race mix ratios is simply not supportable. The hard truth is that the courts have not fashioned an adequate and a precise remedy. It is this court, not the school districts, that is to blame for any disparity between what the court now wants and what the districts actually are. A major part of our problem here arises from the batching of cases for common treatment contrary to Green. School district problems are separate cases or controversies. Each district is entitled under the Constitution and law to our consideration on its own merits or demerits and to have appropriate relief tailored to that district's problems.[28] While acknowledging that this would impose some difficulty, it still must be done. Judicial efficiency and ease of administration of court affairs can never justify short-cutting the rights of litigants before us. This court is not a wholesaler. The demise of all deliberate speed must not be allowed to quicken the Frankenstein monster of impetuous justice.
 
 
 81
 Because the majority reads that part of Singleton which was not affected by Carter as providing that these cases are remanded to district courts for the performance of any necessary part of the full range of functions of a court, no issue is here discussed as to the constitutional problems that would arise if the Office of Education of the Department of Health, Education and Welfare were given the controlling sort of effect suggested by Mr. Justice Harlan's concurrence in Carter. We are in agreement that on remand the court may consider plans submitted by any party or by HEW together with objections or suggested amendments and, after an evidentiary hearing, make a proper judicial determination as to what the rights of the parties and the interests of justice require by way of an order.
 
 
 82
 With the glare of this publicity turned on us, this court is no less than on trial itself-- on trial to see if it can make justice the handmaiden of liberty, or whether we make her serve tyranny. There is more at stake here than the tremendously valuable rights that lie on the surface of this controversy. Much of the vitality of the rule of law hangs in the balance, for we here deal not only with a vast number of people but also with perhaps the most senstitive area to any citizen-- the welfare of his children. Respect for courts and for their decrees is a sine qua non to the acceptance of law as an ingrained way of life. We should do all we can as judges to promote that respect. Unfortunately, we here do much less.
 
 
 83
 The precipitate haste with which complex actions are demanded in the midst of a school year, the brief unexplained command by which it is ordered and the failure to consider separate varying district problems on an individual basis combine to deprive the litigants before us of due process and to destroy the very protection we seek to make equal. I respectfully dissent.
 
 
 84
 COLEMAN, Circuit Judge, concurs in this dissenting opinion.
 
 
 
 [1]
 Judge Wisdom did not participate in Nos. 26285, 28261, 28350 and 28349. Judge Ainsworth did not participate in No. 28342. Judge Carswell did not participate in Nos. 27863 and 27983. Judge Clark did not participate in No. 26285. Judge Ingraham did not participate in any of the within matters
 
 
 [1]
 I continue to abstain in No. 26285
 
 
 [2]
 I most assuredly do not speak here of orders molded to definance or unlawful opposition. Cf. Aaron v. Cooper, 257 F.2d 33 (8th Cir. 1958); 358 U.S. 1, 78 S.Ct. 1399, 3 L.Ed.2d 3 (1958)
 
 
 [3]
 In Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969), our unanimous expression was that Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) resolved all questions except as to mechanics and we were there focusing on the mechanics of accomplishing what Alexander laid down
 
 
 [4]
 The list of freedoms held to be protected from overbroad legislative, executive and judicial action is immense. For some of the more recent subjects, see the following cases: Free Association with others. Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) and cases there cited; Privacy in a public phone booth. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Porongraphy in one's home. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Use of contraceptives. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Free Speech. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Interstate travel. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Foreign travel. Aptheker v. Secty. of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964)
 
 
 [5]
 Brown v. Board of Education of Topeka, Kan., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I)
 
 
 [6]
 Cf. Rule 65(d), Federal Rules of Civil Procedure. Preciseness in injunction orders is compelled both to apprise the party enjoined of what is prohibited and to avoid undue restraint. 7 Moore's Federal Practice 1666, 1667. Cf. Carroll v. Pres. & Com'rs of Princess Anne County, Md., 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)
 
 
 [7]
 419 F.2d 1211 at 1216 (No. 26285, 1969)
 
 
 [8]
 See Mr. Justice Harlan's concurring opinion in Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (No. 944 & 972 January 14, 1970)
 
 
 [9]
 Alexander v. Holmes County Bd. of Education, supra, N. 3
 
 
 [10]
 See e.g. United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), aff. en banc 380 F.2d 385 (1957), and cases there cited, especially Davis v. Bd. of School Com'rs of Mobile County, 364 F.2d 896 (5th Cir. 1966) and Singleton v. Jackson Municipal Separate School District, 348 F.2d 729 (5th Cir. 1965) (Singleton I), which early gave emphasis to the use of HEW plans to create 'unitary' schools; Davis v. Board of School Com'rs of Mobile County, 393 F.2d 690 (5th Cir. 1968); United States v. Board of Public Instruction of Polk County, 395 F.2d 66 (5th Cir. 1968); United States v. Indianola Municipal Separate School Dist., 410 F.2d 626 (5th Cir. 1969); Anthony v. Marshall County Bd. of Education, 409 F.2d 1287 (5th Cir. 1969); Broussard v. Houston Independent School Dist., 395 F.2d 817 (5th Cir. 1968)
 
 
 [11]
 United States v. Jefferson County, supra, N. 10
 
 
 [12]
 Singleton v. Jackson, supra, N. 3
 12A If we had been clear on this subject the Judges of the Northern District of Georgia probably would not have entered their en banc definition by quotient order in United States v. Georgia et al., (CA 12972, U.S.D.C., N.D. Ga., December 17, 1969); Cf. Judge Bootle's subsequent order in Bivins v. Bibb County Bd. of Eduration et al. (CA 1926, U.S.D.C., M.D.Ga., January 21, 1970).
 
 
 [13]
 Henry v. Clarksdale Municipal Separate School Dist., 409 F.2d 682 (5th Cir. 1969)
 
 
 [14]
 Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)
 
 
 [15]
 The way must be left open for experimentation. United States v. Montgomery County Bd. of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969)
 
 
 [16]
 Student freedom of choice was rejected as an end in itself but it certainly was not denied entirely as a useful tool in the Green trilogy. Green v. New Kent County, supra, N. 14; Raney v. Board of Ed. of Gould School Dist., 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Bd. of Commissioners of the City of Jackson, Tenn., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). Freedom of choice was only condemned in situations where statistics showed no meaningful integration had resulted from its use
 
 
 [17]
 Carter v. West Feliciana Parish, supra, N. 8
 17A Court orders, equally with legislative action, are subject to ex post facto limitation. Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).
 
 
 [18]
 Singleton v. Jackson, supra, N. 3
 
 
 [19]
 Black, dissenting, in Green v. United States, 356 U.S. 165, 219, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958)
 
 
 [20]
 See e.g. National Bank of Genesee v. Whitney, 103 U.S. 99, 26 L.Ed. 443 (1880); Peralta v. United States, 70 U.S. (3 Wall.) 434, 18 L.Ed. 221 (1865)
 
 
 [21]
 Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671, reh. den. 371 U.S. 854, 83 S.Ct. 14, 9 L.Ed.2d 93 (1962); Douglas, Stare Decisis, 49 Col.L.Rev. 735
 
 
 [22]
 In fact in McCabe v. Atchison, T. & S.F. Railway Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914), the Supreme Court expressly ruled that the meaning of the Fourteenth Amendment was no longer open to question in affirming the dismissal of an injunction suit seeking to strike down an Oklahoma statute proving for separation of the races on railroad cars
 
 
 [23]
 Brown I, supra; N. 5; Brown v. Bd. of Education of Topeka, Kan., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II)
 
 
 [24]
 380 F.2d 390-396
 
 
 [25]
 See 380 F.2d 389, N. 3
 
 
 [26]
 372 F.2d 836 at 896
 
 
 [27]
 396 F.2d 44 (5th Cir. 1968)
 
 
 [28]
 Green v. New Kent County, supra, N. 14