513 F.2d 244
 19 Fair Empl.Prac.Cas. 576, 9 Empl. Prac.
Dec. P 10,180
UNITED STATES of America, Plaintiff-Appellee,
v.
COFFEEVILLE CONSOLIDATED SCHOOL DISTRICT et al., Defendants-Appellants
Stephen BROWN et al., Plaintiffs-Appellees,
v.
COFFEEVILLE CONSOLIDATED SCHOOL DISTRICT et al., Defendants-Appellants
 No. 74-1160
 United States Court of Appeals, Fifth Circuit
 May 8, 1975
Rehearing and Rehearing En Banc Denied Oct. 10, 1975
 
 Hardy Lott, Greenwood, Miss., for defendants-appellants.
 James O. Ford, Tupelo, Miss., David Rubin, Washington, D.C., H.M. Ray, U.S. Atty., Will R. Ford, Asst.U.S.Atty., Oxford, Miss., Stuart F. Pierson, Ben Krage, Attys., Dept. of Justice, Washington, D.C., Stephen J. Pollak, Richard M. Sharp, William F. Sheehan, III, Washington, D.C., for U.S.A.
 Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 The issue in this case is whether the Coffeeville Consolidated School District improperly failed to re-employ four black teachers, Alma Faye Chapman, Evelyn R. Miller, Robert Bennett, and James A. Lewis. The District Court entered judgment for the teachers and the School District has appealed.
 
 
 2
 The panel unanimously agrees that James A. Lewis should be reinstated and that the case as to Evelyn R. Miller should be remanded for further proceedings. A majority of the panel holds that teachers Chapman and Miller should also be reinstated.
 
 
 3
 * Background
 
 
 4
 In 1969, by its Attorney General, the United States sought to enjoin the Coffeeville School authorities from continuing to operate a dual school system. On March 12, 1970, the District Court, over objections by the government, approved a School Board plan of student desegregation, in which separate schools for boys and girls would be operated in the Coffeeville and Oakland attendance zones. At that time the standard Singleton order was entered. Inter alia, it directed that if there were to be a reduction in the number of teachers or other educational employees the selection of those to be demoted or dismissed would have to be made on the basis of objective and reasonable nondiscriminatory standards from among all the staff of the School District. As usual, it was further provided that upon such dismissal or demotion, no vacancy might be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted until each qualified displaced staff member had an opportunity to fill the vacancy, and had failed to accept an offer to do so.
 
 
 5
 It was further ordered that prior to any reduction in force the Board should develop or require the development of nonracial objective criteria to be used in selecting those to be dismissed or demoted, with further appropriate provisions for the enforcement of that requirement.
 
 
 6
 For reasons not appearing of record, the Coffeeville Consolidated School District did not develop or promulgate the prescribed objective criteria.
 
 
 7
 On October 9, 1970, the District Court by modification of its prior order eliminated student assignment based upon separation by sex, effective at the end of the first semester of the 1970-71 school year. It directed the School Board to submit a new plan of student assignment based upon pairing and zoning. This plan was approved December 3, 1970, to take effect at the beginning of the next semester.
 
 
 8
 During the 1970-71 school year many black students boycotted the school. Members of the black community organized marches and boycotted Coffeeville merchants. There was an unhappy amount of turmoil and confusion. Subsequently, three black teachers were demoted. After a full hearing in February, 1971, these teachers were ordered restored to their prior positions.
 
 
 9
 For reasons, the details of which are far too lengthy to recite here, it was thought in early 1971 that the District faced the loss of twenty-four teacher units for the lack of students in numbers prescribed by state Average Daily Attendance standards. However, this anticipated loss was avoided. Twenty white teachers and three black teachers voluntarily left the system. One white teacher and seven black teachers were not re-employed "for cause." The appellants here are four of the seven blacks who were thus involuntarily terminated.
 
 
 10
 The District hired twelve new white teachers and six new black teachers, which resulted in total employment of thirty-four black teachers and thirty-four white teachers. This was the same ratio of black to white prevailing the previous year and was in compliance with the original District Court order which had required that black and white teachers be employed in equal numbers.
 
 II
 Position of the Parties
 
 11
 The black teacher appellants claim that they were entitled to the benefit of Singleton standards because they were dismissed in anticipation of a reduction in teachers, necessitated by the desegregation process. The School District denies this because, as it turned out, there was no reduction in the number of teachers employed. It is further argued that the School had, in fact, become a unitary one and the Singleton rule did not apply in any event.
 
 
 12
 We must agree with the conclusions of the District Court that at the time these teachers were not re-employed the desegregation process in this school system had not been completed, the school had not become unitary, United States v. State of Texas et al. (San Felipe Del Rio Consolidated School District), 5 Cir., 1975, 509 F.2d 192. The dismissed teachers were entitled to the Singleton protection.
 
 
 13
 Obviously, they did not receive this benefit, and could not have received it, because the School Board simply failed to obey the original order of the Court that objective criteria be developed for dismissals entered on account of or in anticipation of reductions which appeared to be inevitable. Moreover, when the School District found that there were to be no reductions it did not retrace its steps and undo the action caused by mistaken expectations.
 
 III
 Just Cause
 
 14
 The Coffeeville Consolidated School District seeks, however, to justify the dismissals on the grounds of just cause, independently of Singleton requirements.
 
 
 15
 It is the law of this Circuit that under certain circumstances, Singleton notwithstanding, discharges for just cause may be warranted without reference to any pre-established objective, reasonable standards, Thompson v. Madison County Board of Education, 5 Cir., 1973, 476 F.2d 676, 678.
 
 
 16
 " 'Just cause' in a Singleton situation means types of conduct that are repulsive to the minimum standards of decency--such as honesty and integrity--required by virtually all employers of their employees, and especially required of public servants such as school teachers. No pre-established objective criteria are necessary to justify the discharge of a teacher whose conduct does not measure up to these minimum standards of behavior. For example, if a teacher came to school drunk, or was found stealing from the school treasury, or sexually assaulted a student, the school board could substantiate on 'just cause' grounds its firing of that teacher, even though the school system was still in the process of desegregation and whether or not the school board had established any Singleton criteria for discharge or demotion." 476 F.2d 679.
 
 
 17
 The Court was careful to point out what just cause "is not" in a Singleton context:
 
 
 18
 "However, 'just cause' in a Singleton situation does not refer to a teacher's lack of professional credentials, his poor performance in the classroom, his failure to abide by school regulations, his lack of cooperation, or other similar explanations. These types of reasons for discharge fall directly within the scope of Singleton, and accordingly such discharges must be justified on the basis of objective and reasonable standards for dismissal previously set by the school board. If this kind of a discharge can be justified in terms of the established objective standards, it is not for 'just cause'; it is simply a discharge in compliance with Singleton criteria." 476 F.2d 678.
 
 
 19
 Even under Singleton, the hands of a school district are not tied. A school district does not have to put up with incompetency, poor performance, failure to abide by school regulations, lack of cooperation, or the like. All the district has to do is to develop objective, not subjective, criteria, in advance. The purpose of this is to insure that dismissals will not occur solely for racial reasons.
 
 
 20
 Thompson v. Madison County Board of Education laid down another very salutary principle: After a hearing, on notice, the findings and decision of academic administrative bodies are to be upheld by the Courts when reached by correct procedures and supported by substantial evidence, 476 F.2d t 678.
 
 
 21
 The teachers now before us were given prolonged and extensive hearings. Unfortunately, the Board followed this with no findings of fact which could have been reviewed under the substantial evidence rule.
 
 IV
 Action in the District Court
 
 22
 Under these circumstances, the District Judge quite properly proceeded to hold hearings of his own. He made findings of fact and conclusions of law, set forth in United States v. Coffeeville Consolidated School District, D.C., 365 F.Supp. 990.
 
 
 23
 On the hearing for preliminary injunction, the District Court denied the injunction, holding at that time that "we are not dealing with a reduction of staff case, but we are dealing with a case involving an attempt by school officials to discharge for reason of cause". This meant, no doubt, that in the absence of the objective criteria, just cause was the only available defense. After the hearing on the merits the Court found that this was a reduction case. Possibly he was referring to the expected reduction which had set in motion the whole train of events hereinabove discussed. In any event, a review of the record as a whole permits of no defense except that of just cause.
 
 
 24
 The original plaintiffs in the original desegregation suit filed a motion for supplemental relief, April 28, 1971. In that motion it was asserted that "several black teachers", without naming them, have been given notice that their contracts would not be renewed for the 1971-72 school year, that the sole basis of their termination was race, that no reasons or basis for the dismissal had been given, that the dismissal of the black teachers was merely a continuation of a pattern and practice on the part of the School Board in denying blacks equal protection of the law and that the dismissal of the teachers is "meant to have a chilling effect on the black community in their effort to secure this fundamental right." The motion asserted no Singleton violation. The motion, however, concluded with a four line prayer "That this Court grant supplemental injunctive relief to reinstate the black teachers terminated without hearing or good cause, and such further continuing relief as may be necessary". Back pay and attorney fees were not specifically mentioned.
 
 
 25
 After the preliminary injunction was denied, the teachers took no further action. The litigation was fired up the second time, on the merits, by a motion filed by the same original plaintiffs (not the teachers). The teachers are not appellants here, the appellants being the original plaintiffs in the original desegregation suit. Nominally, this includes the United States, although the United States took no part in a hearing on the merits. In any event, the Court had retained jurisdiction over the desegregation process and we have no doubt that the plaintiffs had standing to challenge any Board action which amounted to a substantial interference with that process.
 
 
 26
 We now take up the facts as to each teacher individually.
 
 V
 James A. Lewis
 
 27
 An examination of the evidence with reference to Lewis indicates that all the charges against him were directed toward his competency in the management of the shop in which he conducted his classes. The evidence raises no Thompson v. Madison County Board of Education just cause issue. Obviously, under Singleton requirements Lewis' discharge was improper and the District Court correctly decided that he was entitled to reinstatement.
 
 VI
 Evelyn R. Miller
 
 28
 Most of the allegations with reference to Teacher Evelyn R. Miller had to do with real and supposed deficiencies in the competency of her teaching. As a Singleton matter, this afforded no basis for discharge.
 
 
 29
 There was another charge, however, (undisputed so far as we can find) that Mrs. Miller on occasion punished her students by keeping "two little boys in her class standing for twelve minutes by the watch while touching their toes." Another student, a girl, age twelve, called by Mrs. Miller as her own witness, testified that she had been required to bend over touching her toes for about ten minutes, but that "it did not make her sick". There appears to be no doubt from Mrs. Miller's own testimony that "she customarily disciplined her children by having them stand while touching their toes". The District Court found, however, that she had never been reprimanded for the disciplinary methods she employed.
 
 
 30
 Certainly, if the school authorities knew that she used this method of discipline they should have warned her to quit it and should have taken the appropriate action if she disregarded the warning. This Court has serious doubt, however, that the absence of a warning may excuse an act which the teacher knew, or should have known, was fundamentally wrong, including inexcusable humiliations or punishment which might be dangerous to the health of the child. In the absence of a warning, common decency would tell the teacher not to engage in practices of that kind, particularly when such might very well indicate a form of intolerable sadism. Stated another way, if conduct on the part of a teacher is unnecessarily harsh and harmful to the students, particularly to those of the age who were submitted to Mrs. Miller's jurisdiction, the best interest of the students should be weighed along with Mrs. Miller's rights to retain her un-tenured re-employment. We do not care to establish the precedent in this Circuit, as a matter of teacher employment, that mistreating children may be shielded by failure of superiors to intervene, although if they have knowledge of it they should do so.
 
 
 31
 We feel that the ends of justice would be better served by remanding Mrs. Miller's case to the District Court for a hearing. The extent to which this practice was followed and its effect mentally and physically upon those subjected to it may then be determined, including a finding of whether this practice demonstrated a basic unfitness to be placed in charge of children for educational purposes.
 
 VII
 
 32
 Separate Views of Judges Wisdom and Simpson as to Teachers
 
 Chapman and Bennett
 
 33
 To this point in the opinion, Judges Wisdom and Simpson are in complete agreement with Judge Coleman. Judges Wisdom and Simpson have concluded, however, contrary to Judge Coleman's conclusion, that the record does not permit a holding that the District Court was clearly erroneous in holding that Miss Chapman and Robert Bennett were improperly discharged.
 
 
 34
 (a)
 
 Alma Faye Chapman
 
 35
 Miss Chapman was given a favorable rating but, nonetheless, was not rehired. The School Board offers three reasons: (1) that she discussed the meaning of "queer" with her class of eighth grade boys, allegedly using the most common vulgar term for a homosexual, a ten latter word usually applied to a male; (2) that she gave oral examinations contrary to school regulations; and (3) that the final grades she submitted at the end of the year could not, in many cases, have been arrived at in accordance with explicit school policy.
 
 
 36
 All members of the panel agree that the Singleton requirements were not satisfied. Miss Chapman's dismissal can stand, therefore, only if the school board can show "just cause". Inasmuch as just cause does not include poor performance or failure to abide by school regulations, grounds (2) and (3) above are inapplicable. We are left, then, with the first issue.
 
 
 37
 The evidence on this point was conflicting. It is undisputed that Miss Chapman, in her eighth grade spelling class, was led into a discussion of homosexuality. It is also largely undisputed that she did not initiate the discussion; she tried to thwart it, but finally yielded to student persistence.
 
 
 38
 The dispute centers on the content of the discussion. Denley, the superintendent of the school district, and Russell, the assistant superintendent, testified at the hearing before the school board. Each said that numerous parents had complained about the incident but neither was able to identify specific parents. Russell conceded that it was his duty to take down the names of complaining parents and that he had not done so. Russell could testify only that Miss Chapman had admitted to him that the discussion had taken place, that "that had happened to her before when she had been out--that one thing had happened and she was looking for another", and that "she told her students about her experience when she had gone out with some man". Denley corroborated this testimony: "She said she told them a queer was a [explicit vulgarism deleted] and she said she went on and told them that she had a date with one when she was at Jackson State and that he carried her out and that's all he wanted to do to her." One student testified: "She got to talking about back in her college days when she was going out with a fellow, and she said he was a [same vulgarism]." Another student testified to the contrary, saying that he had never heard her use the words "queer" or "homosexual" or "fag" or any other name that might be used, and that she had mentioned no man at Jackson State.
 
 
 39
 Only one eyewitness testified that she had used the word in question. Denley testified only that she told him she had used that word. His testimony was imprecise. For example, he conceded that he could not remember "whether we went into exact words, or not, whether we did or not". But he could not remember whether she had admitted the accusations against her or simply failed to deny them.
 
 
 40
 Miss Chapman's testimony is not impressive. At the school board hearing, she first testified that she had no recollection of using foul language, but toward the end of the hearing she absolutely denied ever having used such language. There is a conflict as to whether she had discussed her "experiences". At first, she said she "told them about some of my experiences". She answered, "possible", when asked if she had related some of the "things concerning her personal life". Later she testified that she "possibly told them about experiences that I had run across with people of that nature, but I did not tell them what they did". She flatly denied ever having told the students about or describing any date with a "queer". She testified that "I did ot tell them that I have been out with [a homosexual], and I have not.... I didn't even bring myself into the picture".
 
 
 41
 Miss Chapman's testimony may have been slanted in the direction of toning down what she did say in class. She may have discussed, at least to some extent, her personal encounters with queers with her eighth grade class. But there is no indication that the discussion was protracted or that it was ever repeated. A single instance of bad judgment, provoked, possible deliberately, by sexually precocious students? Probably. "Just cause" for dismissal? No.
 
 
 42
 As to the statement, there was little direct evidence. One student testified at the school board hearing. He did not testify at trial before the District Court, nor did any other student from that class. On this point, only one witness testified against her at trial: Superintendent Denley. He testified that she told him of telling her students that a queer is a [same vulgarism]. He was not, of course, present at the alleged incident.
 
 
 43
 This incident appears to have been an afterthought, in light of the little evidence that it was taken seriously at the time. Indeed, Ms. Moorman, the principal of the girls' school to which Miss Chapman was transferred during the school year recommended Miss Chapman for retention, even though she was aware "to a certain extent" of the incident at the boys' school.
 
 
 44
 Judge Keady found: "The credible evidence is that the teacher did not use foul words but discussed sex deviants in general terms, without reference to personal experience." He is the judge of credibility. Judges Wisdom and Simpson cannot say that his finding was clearly erroneous.
 
 
 45
 (b)
 
 Robert Earl Bennett
 The charges against Bennett were:
 
 46
 (1) That he customarily drove to school an auto bearing the bumper sticker reading: "IF AT FIRST YOU DON'T SUCCEED, TRY A-GUN";
 
 
 47
 (2) That in two instances he taped shut the mouths of unruly students;
 
 
 48
 (3) That on a few occasions he paddled students as young as second graders, without having another teacher present and outside of the principal's office, contrary to school regulations.
 
 
 49
 The question here is not professional qualifications. The question is whether his conduct is "repulsive to the minimum standards of decency."
 
 
 50
 As to his alleged physical abuse of children, Judge Keady concluded that "the only thing that Bennett was really guilty of was failing to comply with the school board regulation to carry out this corporal punishment in the presence of the principal or in the presence of someone authorized by the principal". This is an accurate characterization of the charge. Although there was some suggestion that he became overzealous in his paddling (at least one child went home with a bruised bottom) there was not evidence of brutality. Bennett did admit that on one occasion, when his second grade class got out of hand, he paddled the entire class, but, he says, not roughly. This seems unjust, but Bennett may have accepted the military theory that culprits will not repeat their offense if they know that their innocent friends and peers will be punished.
 
 
 51
 The mouth taping seems unnecessary, but there was no evidence that the child involved was particularly offended or hurt, so that this incident has no large proportions.
 
 
 52
 There were other charges against Bennett. As to two of these, Judge Keady held that Bennett had "logical explanations" and "his testimony was not refuted by substantial evidence". Judge Keady found: "Manifestly, there was no evidence whatever that Bennett engaged in violence, or that he advocated violence in dealing with others, or that he was guilty of misconduct toward anyone". He concluded, therefore, "that 'cause' in the Singleton concept did not exist for not rehiring this teacher".
 
 
 53
 The result is that the judgment of the District Court as to Evelyn R. Miller will be vacated and remanded to the District Court for further proceedings not inconsistent with what has been said as to her case. The judgment as to James D. Lewis, Alma Faye Chapman, and Robert Earl Bennett will be affirmed.
 
 VIII
 
 54
 Judge Coleman's Dissent as to Chapman and Bennett
 
 
 55
 Judge Coleman dissents as to Alma Faye Chapman and Robert Earl Bennett. As to these teachers he would reverse.
 
 
 56
 Miss Chapman's job was to teach spelling and mathematics to students in grades seven through ten. Discussion of sexual deviancy or conducting a class in sex were entirely beyond the ambit of her duties and qualifications. During the course of an eighth grade spelling class, a student asked Miss Chapman "what a queer was". She then engaged in a discussion of it. The school district authorities received numerous protests from the parents of these children. Superintendent Denley testified that when he questioned her about the incident she said she had told the class that a queer is a "c--k s--ker", that she had told the class about her experience when she had a date with a queer. Assistant Superintendent Russell testified that Miss Chapman told him that she had related to the class her experiences when she had gone out with a man who was a queer. One of the students testified that Miss Chapman told of her college days when she was going with a fellow that was a --, using the same term which Mr. Denley testified she had used. It seems highly unlikely to me that both the Superintendent and the student would have been either deliberately or unintentionally wrong about this.
 
 
 57
 In her own testimony, Miss Chapman did not directly deny the use of the utterly indecent word which Mr. Denley said she had admitted using. She said only that she could not "recall saying anything of that sort". When asked point blank if she used that word, her answer was: "Not to my knowledge, I did not". She did admit that she told these eighth grade students about experience she had run across with people of that nature, but at a later point she repudiated that testimony. Miss Chapman testified that she thought parents were not giving the students enough sex education and for that reason she also thought it was a good idea that she instruct the students in sex.
 
 
 58
 The District Court held 365 F.Supp. page 998 that "the credible evidence is that the teacher did not use foul words but discussed sex deviants in general terms". It concluded that "while the judgment of a woman teacher discussing the subject at all with young boys might be questioned, her doing so was certainly not an act "repulsive to the minimum standards of decency' required of public school teachers".
 
 
 59
 With deference, I think this finding is clearly erroneous; that the equivocal testimony of the teacher when brought to account for her conduct is wholly unconvincing when compared with the testimony of others, including a student. She did not deny using the term, but successfully, as it now develops, took refuge behind "do not recall" and "not to my knowledge".
 
 Robert Bennett
 
 60
 Leaving aside the factor of incompetency which could be considered only under Singleton standards, Robert Bennett's case is not entitled to any special commendation. In at least two instances he caused the mouths of students to be taped because they were unduly boisterous in class. Bennett admitted doing this but offered the incredible excuse that it was done in part to demonstrate first aid in case of a "busted" lip.
 
 
 61
 Moreover, in an activity wholly unrelated to his duties as a teacher he customarily drove his automobile to school bearing a bumper sticker which read "IF AT FIRST YOU DON'T SUCCEED, TRY A-GUN". He explained this as only a play on words. Be that as it may, it seems to me that any minimally qualified school teacher would be well aware of the obvious connotations of displaying this sticker. He knew that he was exhibiting this suggestively violent sentiment for young students to see on the schoolgrounds. The "thought often becomes the father of the deed". The bad judgment of displaying such sentiments to the students by one of their mentors is something that a school board and the general public ought not to have to tolerate.
 
 
 62
 Possibly it may be said that the display of this bumper sticker was only an exercise of First Amendment freedoms and that, as a matter of fact, it caused no violence or disruption. Displaying the sticker on the street as a personal act and driving it to school everyday among young people open to the power of suggestion are two different things. Talking about the use of a gun at school cannot be equated with the harmless armband of Tinker. I do not think that this Court has ever intended to place the badge of immunity on mouth tapings and gun shibboleths. School boards should not be rendered impotent to deal appropriately with that type of conduct when it is injected into the educational system.
 
 
 63
 In light of the foregoing, I am of the opinion that the conduct of Bennett and Chapman was established by the evidence and that it furnished just cause for not giving them further contracts to teach.
 
 
 64
 As to the reinstatement of Bennett and Chapman, I respectfully dissent.
 
 
 65
 As to the reinstatement of James A. Lewis, I concur.
 
 
 66
 As to the remand for further proceedings concerning Evelyn R. Miller, I also concur.