Joyce Marie MOORE et al., Plaintiffs-Appellees, Cross-Appellants,

v.

TANGIPAHOA PARISH SCHOOL BOARD et al., Defendants-Appellants, Cross-Appellees.

Nos. 76–1500, 77–1174.

United States Court of Appeals, Fifth Circuit.

May 7, 1979.

Robert W. Tillery, Ponchatoula, La., for defendants-appellants, cross-appellees in No. 76–1500.

Jack Greenberg, New York City, for plaintiffs-appellees, cross-appellants in No. 76–1500.

Allen D. Schwartz, Everett E. Nicholas, Chicago, Ill., Joseph E. Anzalone, Amite, La., for defendants-appellants, cross-appellees.

Nelson D. Taylor, Baton Rouge, La., James C. Gray, New York City, A. P. Trudeau, A. M. Trudeau, Jr., Ernest Morial, New Orleans, La., Margaret Ford, Shreveport, La., for plaintiffs-appellees, cross-appellants.

John D. Kopfler, Hammond, La., for Durham, et al.

Before BROWN, Chief Judge, GEE and VANCE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Once again we embark on the well travelled roads of Tangipahoa Parish. This class action school desegregation case has been pending in the federal courts since 1965. In June of 1965, the District Court entered an order requiring the commencement of desegregation through a freedom of choice plan. In July of 1967, then District Judge Rubin entered a comprehensive order directing the consolidation of the school district and instructing the defendants to take immediate steps toward eliminating the effects of their dual school system. Additional orders were entered in the summer and fall of 1968. We heard the defendants' appeal along with 37 other school cases and affirmed the District Court. *Hall v. St. Helena Parish School Board,* 5 Cir., 1969, 417 F.2d 801.[1] On July 2, 1969, Judge Rubin issued further orders, and in September 1969 the defendants began implementation of the court-ordered desegregation plan.

As it has in many other school districts, school desegregation in the Tangipahoa Parish resulted in a general reduction in staff. Many teachers, activity directors, and administrators were discharged or demoted, and many others resigned under pressure. On this appeal we are concerned solely with the claims of eight black teachers that they were discharged, demoted, or discriminated against by the defendant school board in a manner denying them their constitutional and *Jefferson County/Singleton III*[2] rights. The District Court awarded seven of the teachers relief in the form of reinstatement or back pay or both. The defendants appeal these awards on many and various grounds. The plaintiffs cross-appeal the denial of any relief to one of the teachers and contest the amount of back pay awarded another. We affirm the District Court in all respects.

### From There To Here To There And Back Again

The history of these teachers' claims is long and tortuous. Because it is relevant to some of the issues raised by the defendants, we set forth that history in some detail. It begins on July 22, 1969, when the class plaintiffs—Negro children and their parents—filed a motion to hold the defendants in civil contempt of an earlier District Court order, alleging that the defendants "have engaged in a policy and practice of coercing and intimidating Negro teachers in an effort to force Negro teachers to resign their positions." The plaintiffs' motion described the treatment of six black teachers, including the discharges of three teachers (Carolyn Marzett, Aurelia Jones, and Theresa Leonard) whose claims are involved on this appeal. The District Court denied the motion in August 1969, finding no evidence of racial bias in the discharges.

1. We reversed the District Courts in the other 37 cases.

2. *United States v. Jefferson County Board of Education,* 5 Cir., 1967, 380 F.2d 385, 394 (en banc), *aff'g with modifications,* 5 Cir., 372 F.2d 836, *cert. denied, Caddo Parish School Board v.*

*United States,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; *Singleton v. Jackson Municipal Separate School District,* 5 Cir., 1970, 419 F.2d 1211 (en banc), *rev'd and remanded on other grounds,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530, *on remand,* 5 Cir., 425 F.2d 1211.

In August of 1970, the plaintiffs filed a motion for further relief asking the District Court, among other things, to order the reinstatement of five teachers (including, again, Marzett, Jones, and Leonard). An evidentiary hearing was held on August 24, and the District Court denied the motion on September 2, stating

I find that no pattern of racial discrimination by the School Board has been demonstrated, and therefore, deny this motion without prejudice to the right of individual teachers to seek relief in appropriate actions or by individual motion in this matter.

This order was appealed by the plaintiffs.

On October 20, 1970, the District Court set further hearings to consider the claims of discriminatory treatment of various black principals, coaches, and band directors, including two female coaches (Alice Jackson and Ada Walker) whose claims are involved in this appeal. On January 25, 1971, the Court issued an opinion ruling on some of the claims but deferring consideration of the claims of Jackson and Ada Walker pending a recommendation from the previously-established Bi-Racial Committee. The plaintiffs filed an appeal from this order as well, which was consolidated with the appeal from the September 2, 1970 order.

Due to delays in this Court, the appeals were not decided until June 14, 1974. We held:

In light of the intervening decisions of this Court which have interpreted the central authority here involved, *Singleton v. Jackson Municipal Separate School District,* 5 Cir., 1969, 419 F.2d 1211 (en banc) (*Singleton III*), we deem the interests of justice to require that the District Court's decision be vacated and the cause remanded for a current determination of the issues concerning demotion of administrative personnel and the dismissal of faculty members and band directors.

*Moore v. Tangipahoa Parish School Board,* 5 Cir., 1974, 496 F.2d 696, 697 (*Moore I*). We directed the District Judge to "redetermine whether the standards enunciated in *Singleton III* and our subsequent decisions have been complied with" and instructed him that "to the extent that he may find the school board actions did not meet the *Singleton III* standards, he shall grant such relief as is appropriate."

Following the remand, Judge Rubin promptly held a pre-trial conference on August 16, 1974. The parties were ordered to prepare pretrial memoranda. The plaintiffs filed their pretrial memo on January 21, 1975, in which they set forth claims for injunctive and back pay relief on behalf of Jones, Marzett, Leonard, Jackson, Ada Walker, Gloria Duplessis, Mary Walker, and Melvileen Burton. Duplessis, Mary Walker, and Burton were dismissed or forced to resign at the end of the 1969–70 school year. It appears that the 1975 pretrial memorandum was the first time that their claims had been formally presented to the District Court, though their dismissals had come up during testimony in the earlier proceedings.

The defendants responded to the plaintiffs' memorandum on February 28, 1975, admitting or denying the plaintiffs' 166 proposed findings of fact. On March 3, the District Judge entered a comprehensive pretrial order setting forth the issues for trial. One of the issues listed was the claims of the individual teachers.

Trial on the teachers' claims was had on May 15.[3] On December 19, 1975, the District Court ruled in favor of seven of the teachers—Marzett, Jones, Jackson, Ada Walker, Duplessis, Mary Walker, and Burton—and against Leonard. The Court stated that it would refer the determination of back pay to a Special Master if the parties could not agree on an amount. They could not and on February 3, 1976, the determination of back pay was referred to a Master. He heard evidence and entered his findings on July 20. These findings were adopted by the District Judge, and final judgment against the School Board was entered on August 11, 1976.

3. The other issues were settled before trial.

The defendants filed an appeal from the December 1975 opinion of the District Court in January of 1976 (No. 76–1500), which was stayed pending the determination of the amount of back pay. After entry of the August 11 judgment, the plaintiffs filed a cross-appeal. The defendants then filed a motion for a new trial in the District Court directed to all of the issues. In addition, the defendants raised for the first time the contentions that (i) the Court could not award back pay relief because the teachers had never been made parties to the litigation and (ii) both back pay and injunctive relief were barred by either the statute of limitations, laches, or both. This motion was denied. The defendants filed an appeal from the order denying a new trial (No. 77–1174), which has been consolidated with their earlier appeal from the December 1975 opinion.

### Monroe On The Rocks

■ The defendants raise two jurisdictional arguments. They contend, first, that the Tangipahoa Parish School Board is not a "person" under 42 U.S.C.A. § 1983, see *Monroe v. Pape,* 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, and that the District Court's award of reinstatement and back pay against the School Board therefore cannot stand. Whatever merit this argument may have had before the Supreme Court's recent decision in *Monell v. Department of Social Services,* 1978, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, that decision controls this issue unfavorably to the defendant. In *Monell,* the Court overruled *Monroe, supra,* and held:

Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

436 U.S. at 690, 98 S.Ct. at 2035, 2036. Because there is no doubt but that personnel decisions are "officially adopted and promulgated" by the members of the School Board, the defendants' argument fails.

### Mt. Healthy Straight Up

■ The defendants' second jurisdictional argument is that the awards of back pay against the School Board are barred by the Eleventh Amendment. The Supreme Court faced a similar question in *Mt. Healthy City Board of Education v. Doyle,* 1977, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471, and analyzed it as follows:

The issue here turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, upon the nature of the entity created by state law.

429 U.S. at 280, 97 S.Ct. at 572. The Court then examined Ohio law and concluded on the basis of that examination that "[o]n balance, the record before us indicates that a local school board . . . is more like a county or city than it is like an arm of the State." Cases from this Circuit, some of which were decided before *Mt. Healthy,* have employed a similar analysis and reached a similar result. *See Campbell v. Gadsden County District School Board,* 5 Cir., 1976, 534 F.2d 650, 656; *Adams v. Rankin Board of Education,* 5 Cir., 1975, 524 F.2d 928, 929, *cert. denied,* 1978, 438 U.S. 904, 98 S.Ct. 3121, 57 L.Ed.2d 1146. As we stated in *Campbell, supra,* "the Eleventh Amendment does not bar such awards so long as the entities sued are locally controlled, essentially local in character, and the funds to defray the award would not be derived primarily from the State treasury." 534 F.2d at 656.

The District Judge correctly applied this law to the facts of this case. He stated:

Louisiana school boards, such as the defendant, have the power to sue and be sued. L.S.A.–R.S. 17:51. They have the power to contract. L.S.A.–R.S. 17:81, 17:83. They have the power to purchase, hold and sell property. L.S.A.–R.S. 17:81,

17:87.6. They have the power to borrow funds. L.S.A.–R.S. 17:89. They have the power to, and in fact do, levy and collect taxes from which back pay claims can be met. *Smith v. Concordia*, [W.D.La., 1975, 387 F.Supp. 887, 891].

Both the Louisiana courts and federal district courts in Louisiana have consistently held that school boards are autonomous political subdivisions and not the alter ego of the state from the standpoint of sovereign immunity. *Orleans Parish School Board v. Williams*, La.App.1974, 300 So.2d 848; *Smith v. Concordia Parish School Board*, supra.; *Morgan Dallas Corp. v. Orleans Parish School Board*, E.D.La.1969, 302 F.Supp. 1202. See also, *Bd. of C. P. of New Orleans v. Splendour S. & E. Co.*, La.1973, 273 So.2d 19.

The District Judge is an able and experienced Louisiana lawyer and teacher, and we concur in his analysis of the status of school boards as autonomous political entities under Louisiana law. *Cf. Bishop v. Wood*, 1976, 426 U.S. 341, 345–47, 96 S.Ct. 2074, 48 L.Ed.2d 684.

### Coffeeville With A Twist

■ The individual teachers were not added as parties to this litigation. In their motion for a new trial filed after entry of final judgment, the defendants urged for the first time that this circumstance precluded the awarding of back pay. They renew this argument on appeal, phrasing it in terms of the standing of the plaintiff class—Negro children and their parents in the Tangipahoa Parish—to assert the claims of the teachers for back pay.

As the defendants concede, it is well-settled that the plaintiff class has standing to protest the School Board's discriminatory conduct toward the black teachers and, further, that the District Court could properly order the teachers' reinstatement. *See United States v. Coffeeville Consolidated School District*, 5 Cir., 1975, 513 F.2d 244, 249. The nature of and relationship between back pay claims and reinstatement claims was explored in *Harkless v. Sweeny Independent School District*, 5 Cir., 1970,

427 F.2d 319, *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439. In that case we held that the School Board was not entitled to a jury trial on teachers' claims for back pay when those claims are presented in connection with equitable claims for reinstatement:

The prayer for back pay is not a claim for damages, but is an integral part of the equitable remedy of injunctive reinstatement. Reinstatement involves a return of the plaintiffs to the positions they held before the alleged unconstitutional failure to renew their contracts. An inextricable part of the restoration to prior status is the payment of back wages properly owing to the plaintiffs, diminished by their earnings, if any, in the interim. Back pay is merely an element of the equitable remedy of reinstatement. See *Smith v. Hampton Training School for Nurses*, supra [4 Cir., 360 F.2d 577]. See also *NLRB v. Jones & Laughlin Steel Corp.*, 1937, 301 U.S. 1, 48, 57 S.Ct. 615, 81 L.Ed. 893; *Agwilines, Inc. v. NLRB*, 5 Cir., 1936, 87 F.2d 146, 151.

The district court concluded that *NLRB v. Jones and Laughlin Steel Corp.*, supra, and *Agwilines, Inc. v. NLRB*, supra, were no longer viable in light of the more recent decisions of *Beacon Theatres, Inc. v. Westover*, 1959, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988; *Dairy Queen, Inc. v. Wood*, 1962, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44; and *Thermo-Stitch, Inc. v. Chemical-Cord Processing Corp.*, 5 Cir., 1961, 294 F.2d 486, 489. None of these cases involved back pay. Each involved separate equitable and legal claims joined in the same case. The legal claims were for resolution by the jury. The back pay issue here was not a separate legal claim—rather it was a part of the main equitable claim—reinstatement. The same is true as to the underlying factual issues pertaining to the claims to reinstatement.

427 F.2d at 324. Although *Harkless* involved claims brought by individual teachers as plaintiffs and addressed a different question than that presented in this case, we think that its rationale applies here. As

*Harkless* stated, the awarding of back pay is "merely an element of the equitable remedy of reinstatement." Since it is undisputed that the class plaintiffs could properly seek, and the District Court could properly grant, the nonparty teachers' reinstatement, it follows that the plaintiffs could seek, and the District Court could grant, back pay relief as "part of the main equitable claim—reinstatement."[4] Indeed, we held as much in *United States v. Coffeeville, supra*, though without saying so. In that case, the plaintiff class filed a motion for supplemental relief seeking the reinstatement of several teachers. Finding *Singleton III* violations, the District Court ordered reinstatement with back pay. *United States v. Coffeeville*, N.D.Miss., 1973, 365 F.Supp. 990. On appeal, we recognized that the teachers were not parties, 513 F.2d at 249, yet affirmed in whole the District Court's orders as to three of the teachers involved. *See also Adams v. Rankin County School Board*, 5 Cir., 1973, 485 F.2d 324, 326–27, a case in which the United States intervened and asserted claims on behalf of black teachers and principals. The District Court denied relief. We reversed and remanded, holding in part that if the District Court found on remand that black educators had been discriminated against under the *Jefferson County* and *Singleton III* standards, it "must order their reinstatement with appropriate back pay and other equitable relief."

### Rule 8

■ In their motion for a new trial, the defendants also raised for the first time the defenses of laches and the statute of limitations. Under F.R.Civ.P. 8(c), laches and the statute of limitations are affirmative defenses. Not having raised these defenses in their pretrial memorandum (which served, in effect, as the answer) or in their posttrial brief, the defendants have waived them. *See Pearce v. Wichita County*, 5 Cir., 1979, 590 F.2d 128, 134; *Dunn v. Koehring Co.*, 5

Cir., 1977, 546 F.2d 1193, 1199. Their argument that they should be allowed, under F.R.Civ.P. 15(c), to amend their pleadings, or that the pleadings should be treated as if they had actually raised the defenses, is without merit. The defenses were not tried with "the express or implied consent of the parties," as required by Rule 15.

■ In an effort to avoid this straightforward application of the Federal Rules, the defendants argue that we should apply the Louisiana procedural rules governing when the defenses of limitations and laches can be raised. Under Louisiana law, the plea of prescription (the Louisiana equivalent of the statute of limitations) can be raised at any time, even on appeal. La.Civ. Code Art. 3464; L.S.A.—C.C.P. Art. 2163. It is true that federal courts look to the applicable state limitations statute, including its tolling provisions, in determining the timeliness of claims under the Civil Rights Acts. *See Johnson v. Railway Express*, 1975, 421 U.S. 454, 462, 95 S.Ct. 1716, 44 L.Ed.2d 295; *Page v. U. S. Industries*, 5 Cir., 1977, 556 F.2d 346, *cert. denied*, 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796. But adoption of the state limitations period does not require the supplanting of the Federal Rules governing the procedure by which affirmative defenses, including the defenses of limitations and laches, must be raised. We look to the state limitations period only because Congress has failed to specify one. The Federal Rules, however, are most explicit in setting out how and when affirmative defenses can and must be raised.

### The Merits

The defendants urge that the District Court erred in granting relief to Jones, Marzett, Jackson, Duplessis, and Burton. The plaintiffs cross-appeal the denial of complete relief to Burton and of any relief to Leonard. We will deal first with the claims that the District Court allowed, then with those that he denied in whole or in part.

---

**4.** Two of the teachers were eventually awarded back pay only. This circumstance is without significance, however, as the record indicates that the class plaintiffs originally sought reinstatement on behalf of both teachers. The reinstatement claims were dropped after supervening events rendered reinstatement either unattractive or moot.

■ *Jones and Marzett.* Jones and Marzett were both terminated in the summer of 1969. In his August 1969 oral opinion denying the plaintiff's motion for further relief, Judge Rubin found that there was no racial bias or discrimination in their terminations. The defendants use this finding, which was not appealed, to argue that the District Court erred in applying *Singleton III* standards in reviewing the Board's failure to rehire Jones and Marzett in 1969 and succeeding years.[5]

The defendants' argument misses the mark. In the December 1975 opinion, Judge Rubin did not retreat from his original finding that there was no racial discrimination in the summer 1969 discharges of Jones and Marzett, nor did he retroactively apply *Singleton III* (which was decided December 1, 1969 and effective February 1, 1970) to evaluate the 1969–70 failures to rehire. As *Lee v. Macon County Board of Education (Muscle Shoals)*, 5 Cir., 1971, 453 F.2d 1104, makes clear, *Jefferson County* applied to the 1969–70 failure to rehire and *Singleton III* to the subsequent failures to rehire, and Judge Rubin correctly concluded that the School Board violated the *Jefferson County/Singleton III* recall rights of Jones and Marzett in not offering them positions for the 1969–70 and succeeding terms.

Under the settled law of this Circuit since 1967, new teachers may not be hired for jobs which former teachers, displaced as a result of a desegregation reduction, are minimally qualified. *See Jefferson County,*

supra; *Adams v. Rankin County Board of Education*, 5 Cir., 1973, 485 F.2d 324, 326–27; *Kelly v. West Baton Rouge Parish School Board*, 5 Cir., 1975, 517 F.2d 194, 199–201. Judge Rubin found that the summer of 1969 saw a staff reduction due to desegregation in the Tangipahoa Parish, and this finding is clearly supported by the record—the schools were combined at the end of the 1968–69 school year, and some 94 less teachers were employed in 1969–70 than in 1968–69. Jones and Marzett were thus terminated during a desegregation reduction and fell within the protective ambit of *Jefferson County/Singleton III*'s provisions regarding reinstatement. *See Lee v. Macon County Board of Education (Muscle Shoals)*, 5 Cir., 1971, 453 F.2d 1104. Judge Rubin found further that whites were hired in 1969 for positions which Jones and Marzett were qualified to fill. Jones and Marzett should have been offered reemployment and were not, and they are therefore entitled to the relief granted.

■ *Jackson.* Jackson coached basketball at Greenville Park School in 1967–68. The girls' basketball program was terminated at the end of that year, principally because of transportation and financial problems. In 1969–70, Jackson was assigned to a formerly white school. The white female basketball coach at Hammond took a leave of absence in the second semester of 1969–70 and Jackson applied for the position, but a white with less experience was given the job. The original coach returned for one

---

5. The defendants also point to Judge Rubin's finding in his August 1969 oral opinion that Jones and Marzett were discharged for failure to satisfy teaching requirements and try to fit this case under our recent cases denying relief because the challenged discharges were not "desegregation related." *See Wright v. Houston Independent School District*, 5 Cir., 1978, 569 F.2d 1383; *Ayers v. Western Line Consolidated School District*, 5 Cir., 1977, 555 F.2d 1309; *Hardy v. Porter*, 5 Cir., 1977, 546 F.2d 1165. This argument simply will not wash. The decline in the number of positions available in the school system for which Jones and Marzett were qualified was due to a staff reduction due to desegregation, and at the time of their dismissals there was a distinct "population" of teachers in the Tangipahoa Parish.

*See Lee v. Macon County Board of Education*, 5 Cir., 1971, 453 F.2d 1104, 1110. Judge Rubin found in the December 1975 opinion and December 1976 order denying a new trial that Jones and Marzett were dismissed because they were untenured and had less experience than other comparable teachers. They were not terminated because their positions had become excess due to a factor unrelated to desegregation. To accept defendants' argument—that discharges which are based on an evaluation of the teacher's qualifications and which take place in the middle of a desegregation reduction are not "desegregation related"—would eviscerate the protections of *Singleton III* and *Jefferson County*. Cf. *Thompson v. Madison County Board of Education*, 5 Cir., 1973, 476 F.2d 676.

year, then retired. Jackson again sought the assignment, and it was again given to a white female.

Judge Rubin correctly declined to apply *Jefferson County* and *Singleton III* to Jackson's loss of her coaching position, for that loss was a result of factors in no way related to school desegregation. *See* cases cited note 5, *supra.* He concluded, however, that the 1970 and 1971 refusals to offer Jackson the coaching assignment at Hammond High were racially motivated and awarded her relief accordingly.

The defendants attack the District Court's finding of racial discrimination. The School Board's articulated reason for not giving Jackson the Hammond job was her failure to properly chaperone her students on out-of-town trips while a coach at Greenville. These problems arose out of the fact that Jackson lived in Hammond and would leave the bus there rather than accompany it until all of the students, some of whom lived a good distance from Hammond, were taken home. The defendants argue that under *McDonnell Douglas Corp. v. Green*, 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, Jackson had the burden of showing that this articulated reason was a mere pretext and that she failed to carry that burden.

This argument cuts no better figure here than it did below. Judge Rubin discussed the Board's justification for refusing to give Jackson the Hammond job.[6] He rejected it, finding that "there would have been no chaperonage problems if [Jackson] had coached at Hammond," for most of Hammond's students lived in the near vicinity. In view of Jackson's qualifications, the offer of the job to a white with less experience, and the lack of any legitimate reason for denying Jackson the job, the finding of racial discrimination was not clearly erroneous.

*Duplessis.* Duplessis, an untenured and uncertificated vocal music teacher, began teaching in the Tangipahoa Parish school system in 1962. In 1969–70 she was assigned to teach first through eighth grade music at two formerly white schools. However, she was given no assigned duties at one of these schools until January, the reason given by the principal being that there was no work for her until a formerly black school was consolidated with the white school. At the end of the 1969–70 school year, Duplessis was told by the principal that he and a school board member had decided that she should resign.

Judge Rubin found that in 1969–70, there were ten vocal music teachers, of whom four were black and six white. In 1970–71, there were nine vocal music teachers, two black and seven white. The School Board hired two whites to teach vocal music for the 1970–71 school year, neither of whom had much experience, and in 1971–72 hired another white. He concluded that, because no objective standards were used, Duplessis's dismissal was in violation of *Singleton III* and awarded her back pay from the time of her forced resignation to the time of judgment.

■ The defendants contest the applicability of *Singleton III* to Duplessis's termination.[7] *Singleton III* was decided by this Court on December 1, 1969, effective February 1, 1970; Duplessis's termination occurred in the summer of 1970. The defendants argue, however, that the *Singleton III* standards were not imposed on the Tangipahoa Parish school system until September 1970.

---

6. Indeed, that Judge Rubin carefully considered the School Board's asserted nondiscriminatory reason for denying Jackson the Hammond job is shown by the fact that he declined to award Jackson back pay for all of the 1969–70 school year and for any of the 1970–71 school year despite her testimony that she sought employment as a coach at a junior high for that period. In part, his reasoning was that the chaperonage problems would have persisted, as the junior high was a good distance from Jackson's home. What may be a legitimate concern in one context may be a pretext for discrimination in another.

7. The defendants concede that *Singleton III* was applicable during the time Duplessis was available for reinstatement.

The defendants misinterpret the thrust of *Singleton III*. As we have said on more than one occasion, *Singleton III* "established *as a principle of law* the proposition that school boards must, when converting from a dual system to a unitary one, establish and abide by written non-racial criteria for the promotion, retention, etc. of faculty." *Adams v. Rankin County Board of Education*, 5 Cir., 1973, 485 F.2d 324, 327 n. 2 (emphasis added). *Singleton III* "speaks generically, not only to the defendants specifically enjoined in that seminal case." *Lee v. Macon County Board of Education (Muscle Shoals)*, 5 Cir., 1971, 453 F.2d 1104, 1112. The *Singleton III* standards govern the termination of Duplessis, a termination that occurred nearly five months after *Singleton III* was effective. *See Kelly v. West Baton Rouge Parish School Board*, 5 Cir., 1975, 517 F.2d 194, 199.

■ The defendants urge that, even if *Singleton III* applies, the termination and failure to rehire was not in violation of the *Singleton III* standards because Duplessis's lack of certification constituted an objective, reasonable, nondiscriminatory reason to terminate her and to deny reinstatement. Again, this argument depends upon a mischaracterization of *Singleton III*. The question is not whether the termination and failure to rehire can be after-the-fact justified on the basis of objective criteria, but rather whether the School Board in fact used pre-established, objective criteria in an across-the-board evaluation of all teachers. Judge Rubin found that the Tangipahoa Parish School Board did not do so—instead, as he stated in his December 1974 opinion, "it was decided that [Duplessis] should resign." His findings are fully supported by the evidence.

The defendants' final argument that Duplessis's dismissal was justified under the "just cause" exception to *Singleton III* borders on the frivolous. *See United States v. Coffeeville Consolidated School District*, 5 Cir., 1975, 513 F.2d 244; *Thompson v. Madison County Board of Education*, 5 Cir., 1973, 476 F.2d 676.

*Burton.* During the 1969–70 school year, the School Board announced that it would require all nontenured teachers to take the National Teachers Examination (NTE). Burton, a nontenured high school teacher, received a letter advising her that she had not taken the examination and requesting that she do so. When she did not, she was terminated.

Burton later took the NTE and passed. She informed the School Board of this in late July of 1971, after the application period for the 1971–72 school year had ended. She has not since been reemployed.

Judge Rubin found that the NTE requirement was objective and announced prior to its taking effect. He therefore concluded that Burton's dismissal comported with *Singleton III*. However, he also held that Burton's *Singleton III* recall rights had been violated since Burton should have been offered reemployment after she passed the test in 1971. He awarded Burton reinstatement with back pay from 1972.

The plaintiffs attack the District Court's finding that Burton's dismissal complied with *Singleton III* requirements. In effect, they attack the use of the NTE as an evaluative tool in a staff reduction due to desegregation, relying heavily on *Baker v. Columbus Municipal Separate School District*, 5 Cir., 1972, 462 F.2d 1112. In *Baker*, we upheld the District Court's finding that the defendant school board's adoption of a NTE score requirement as a condition of employment was motivated by the purpose of barring more black teachers than whites from employment and reemployment. To be contrasted with *Baker* is *Lee v. Macon County Board of Education (Sumter County)*, 5 Cir., 1972, 463 F.2d 1174, a case in which we upheld the use of NTE scores as a comparison factor in a *Singleton III* situation. *See also United States v. Texas Education Agency*, 5 Cir., 1972, 459 F.2d 600, 604.

■ As *Baker* establishes, adoption of a NTE requirement is impermissible when shown to have been motivated by a discriminatory purpose. In the absence of such a showing, however, use of NTE scores in evaluating teachers is generally permissible. In addition to *Lee, supra,* see *United States v. State of South Carolina*, 1978, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (summari-

ly affirming District Court's rejection of Fourteenth Amendment challenge to South Carolina's use of NTE scores in hiring and classifying teachers). Here, the District Court found that "there is no racial bias on the test, or differential grading." Although the plaintiffs have cited statistical evidence showing that the NTE had some disproportionate impact on black teachers in Tangipahoa Parish, we do not think that the District Court erred in finding that they failed to show a racially discriminatory purpose in its adoption and use as an evaluative tool. Accordingly, Burton's dismissal for refusing to take the NTE did not violate *Singleton III.*

■ The defendants attack the District Court's conclusion that Burton should have been rehired after she took and passed the NTE. They concede that had Burton taken the examination and failed it in the first place, she would have been entitled to reinstatement once she had passed the test and a vacancy occurred. The relevance of the proffered distinction—between a teacher who takes the test and fails it, and one who simply refuses to take the test—escapes us. Surely the refusal to take the NTE does not amount to *Singleton III* "just cause," as the defendants seem to suggest, for that term has been interpreted as referring to "types of conduct that are repulsive to the minimum standards of decency such as honesty and integrity." *Thompson v. Madison County Board of Education,* 5 Cir., 1973, 476 F.2d 676, 679.

■ *Leonard.* Leonard was dismissed in the summer of 1969. In his August 1969 order, Judge Rubin found, as he had with respect to the dismissals of Jones and Marzett, that racial discrimination did not cause the termination of her employment. He reaffirmed this finding in the December 1975 opinion. Leonard's dismissal was therefore not in violation of the then-prevailing (1969) law regarding dismissals due to a desegregation reduction. *See Jefferson County, supra; Lee v. Macon County Board of Education (Muscle Shoals),* 5 Cir., 1971, 453 F.2d 1104, 1113–14.

Even so, as our discussion of the Jones and Marzett claims demonstrates, Leonard had *Jefferson County/Singleton III* recall rights. To be entitled to reinstatement, however, she must have been qualified to fill the available vacancies. Judge Rubin, observing that she lacked certification by some 14 credit hours at the time of her dismissal and that she is not presently certified, found that Leonard is not "presently qualified to be offered employment." The plaintiffs dispute this finding, arguing that Judge Rubin overlooked sworn documentary evidence submitted with their posttrial brief which allegedly showed that Leonard was working toward certification and lacked only three hours credit to become certified. They do not dispute, however, that Leonard was, and remains, uncertified. Based on our review of the record, we do not believe Judge Rubin's finding that Leonard was unqualified to be clearly erroneous.

### Conclusion

In conclusion, it is enough to say that the District Judge correctly applied the law to the facts as he found them. We have come to the end of our journey. More important, this nearly ten-year-old case has hopefully come to an end as well.

AFFIRMED.