725 F.Supp. 307 (1989)
UNITED STATES of America, Plaintiff,
Charles Thomas, Intervenor,
v.
The STATE OF MISSISSIPPI, et al. (Choctaw County School District), Defendants.
Nos. WC70-36-B, WC84-274-B.
United States District Court, N.D. Mississippi, W.D.
November 20, 1989.
*308 Nathaniel Douglas, Educational Opportunities Litigation Section, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., Dennis Sweet, Jackson, Miss., for plaintiff.
Thomas A. Coleman, Ackerman, Miss., for defendants.

MEMORANDUM OPINION
BIGGERS, District Judge.
Following a bench trial on plaintiff Thomas' claims and a hearing on Choctaw County School District's motion for adjudication of unitary status, the court took this consolidated cause under advisement. Upon due consideration of the evidence and the parties' post-trial memoranda, the court is ready to rule in accordance with Rule 52 of the Federal Rules of Civil Procedure.

I. Introduction
On July 9, 1970 the United States initiated Cause No. WC70-36-B-D alleging that the Choctaw County School District [CCSD] was operating a racially dual system of public education in violation of the fourteenth amendment and the Civil Rights Act of 1964. On August 5, 1970 the court issued a consent decree providing for desegregation of students, faculty and other staff, student transportation, and extracurricular activities. The provisions regarding faculty and staff displacements were implemented in Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir.1969) (en banc), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 *309 L.Ed.2d 530 (1970) (Singleton III). Singleton prescribed detailed standards for the transition from a dual to a unitary school system
[t]o ensure that black school personnel were not disparately impacted by staff reductions or rearrangements occasioned by the merger of previously one-race schools....
Pegues v. Morehouse Parish School Board, 706 F.2d 735, 738 (5th Cir.1983). The court retained jurisdiction to "insure full compliance" with the consent decree through
not only the implementation of the desegregation plan but also "the achievement of the ultimate goala unitary school system in which the State does not discriminate between public school children on the basis of race."
Pitts v. Freeman, 755 F.2d 1423, 1426 (11th Cir.1985) (quoting Lee v. Macon County Board of Education, 584 F.2d 78, 81 (5th Cir.1978)).
On August 3, 1984 plaintiff Charles Thomas, a black employee of the CCSD, instituted Cause No. EC84-274-B-D alleging violation of the Singleton provisions in the consent decree and racial discrimination in violation of 42 U.S.C. §§ 1981, 1983, and 2000e et seq., Title VII of the Civil Rights Act of 1964. The United States Magistrate granted plaintiff Thomas' motion for leave to intervene in Cause No. 70-36-B-D and consolidated both actions. Thomas seeks reinstatement and back pay, including a housing and utility allowance, for the CCSD's allegedly wrongful demotion and refusal to reinstate him on three occasions. The trial of Thomas' claims was consolidated with the hearing on the CCSD's motion for adjudication that it has achieved unitary status.

II. Findings of Fact
In 1970 when the school desegregation order was issued, Thomas was the principal of Choctaw County Training Center, an all-black high school in the CCSD. Thomas was a math teacher and coach during the 1969-70 school year and was appointed principal on June 25, 1970; he served as principal until September 2, 1970. Pursuant to the desegregation order, Choctaw County Training Center and Ackerman High School, an all-white high school in the CCSD, were consolidated into one school known as Ackerman High School. At the outset of the 1970-71 school year, Kenneth Steve Clark, the white principal of the formerly all-white Ackerman High School, and Thomas were appointed co-principals of the newly organized Ackerman High School. Clark moved into Thomas' office and Thomas was assigned to a separate facility where special education and vocational programs were conducted. After entry of the consent decree, the CCSD consisted of one other high school, Weir High School, and three elementary schools with only one principal (white) assigned to each. Clark's salary exceeded Thomas' salary and only Clark was provided free housing and a utilities allowance. Clark had authority over the administration of the school including curriculum and hiring and firing of teachers and other personnel, as did Thomas when he was the principal of the formerly all-black school. Thomas testified that Clark overruled his decisions. Jessie Davidson (black) and Harold Whittington (white), teachers at Ackerman High School, testified that they considered Clark and his successor, Thomas Murphy, to be the principal and Thomas the assistant principal.
In 1972 Clark resigned and Thomas applied for the position vacated by Clark but was not interviewed by Superintendent W.M. Perrigin or the CCSD School Board. Under state law, the school board may employ only principalship applicants recommended by the superintendent. Miss.Code Ann. § 37-9-15. Both Thomas and Murphy, the white applicant who was hired, had AA certificates. Thomas had twenty-one years of experience in the field of education in the CCSD and Murphy had eleven years of experience outside the CCSD.
In 1978 Thomas applied for the position vacated by Murphy; the school board hired Michael Taylor, a white applicant, who had an AA certificate and seventeen years of experience outside the CCSD. Thomas had an AAA certificate and twenty-seven years *310 of experience in the CCSD. Harvey Black, a former school board member, testified that Taylor was hired because he had other skills in addition to his educational background and experience.
Both Murphy and Taylor were paid a higher salary than that of Thomas and received free housing. Murphy received a utilities allowance which was terminated after Murphy resigned. Thomas has never received such benefits. Unlike Murphy and Taylor, Thomas taught classes and monitered the cafeteria during lunch. Two 1973 memoranda from Superintendent Perrigin addressed Murphy as "Principal" and Thomas as "Assistant Principal." Thomas testified that he assisted in teacher evaluations during 1981-82 upon Taylor's request but Taylor recommended teaching applicants to the superintendent. See Miss. Code Ann. § 37-9-17 (only the principal recommends teaching applicants to the superintendent).
Thomas applied for the principalship in 1983, was rated among the top four applicants out of over twenty by a consultant, and was interviewed by the school board. Each board member graded the applicants' essay tests which covered areas such as curriculum improvement and student discipline. The school board hired Raburn McLeod, a white applicant, who had an Ed.D., a degree equivalent to an AAAA certificate, and fifteen years of experience outside the CCSD. Thomas had an AAA certificate and thirty-two years of experience in the CCSD. McLeod was also provided free housing before buying a home.
On each occasion, the CCSD hired white applicants outside the CCSD on the ground that they were more qualified than Thomas. The CCSD attempted to establish that Thomas' mishandling of student discipline was one reason he was not selected. The court finds that the school board minutes offered by the CCSD and testimony of Superintendent Ty Cobb and school board member Shirley McGaugh do not establish that Thomas was directly responsible for any student discipline problem. Thomas' office was not even located in the high school building where most classes were held and where the alleged problems arose. Thomas testified that student discipline was his responsibility only when the principal was unavailable. Whittington and Davidson testified that Thomas shared the responsibility with Murphy and Taylor.
In 1983, the CCSD offered Thomas the newly created position of Assistant Superintendent for Supportive Services for the supervision of food services and management of school buses and bus routes previously handled by the head mechanic. Thomas repeatedly declined but eventually accepted the position after the principalship was filled in 1983 when he was told by Superintendent Cobb that his termination was the only alternative. As assistant superintendent, Thomas recommends for hiring and supervises shop foremen, mechanics and bus drivers, reviews the budgets for Chapter I and special education programs, helps recruit black applicants for teaching and other staff positions, and attends school board meetings as an intermediary between the CCSD and the black community. The board has occasionally requested his opinion with respect to hiring decisions but he has no voting authority and no voice regarding academic curriculum. Superintendent Cobb testified that Thomas is second in command and yet his salary is less than the salary paid to the principal of Ackerman High School. Thomas testified that his appointment was not a promotion because he was removed from the school's academic environment.
No black has held the position of superintendent in the CCSD. The school board has had only one black member, Samuel Kennedy, who was appointed to fill Harvey Black's unexpired term in 1988 and was re-elected to serve a full six-year term. Superintendent Cobb testified that only one of eleven administrative vacancies as of 1985 was filled by a black when Thomas was appointed assistant superintendent. No black has served as the principal of any school in the CCSD since the issuance of the desegregation order. Prior to court-ordered desegregation, 39% of CCSD teachers were black. Thereafter, the percentage of black teachers has steadily declined to 22% in 1981. At the time of the hearing, *311 25% were black. Only four black teachers were employed at Ackerman High School at the time of the hearing. Two blacks teach special education, one teaches the Chapter I program, and only one teaches a substantive course.
It is undisputed that one black teaching applicant who was the most qualified applicant was not hired as a result of the mishandling of her application. In addition, Superintendent Cobb testified in his deposition that Thelma Nichols, an experienced black teaching applicant was not hired because she was terminated from another school district and had a discipline problem. He testified at trial that Nichols in fact left her previous position because of depleted funding and no evidence supports the allegation of a discipline problem.
In 1986 a group of black citizens in Choctaw County complained to the school board about the low employment of blacks, exclusion of black students from programs for gifted and talented students and accelerated academic classes, and failure to integrate the cheerleader squads. Thereafter, the black students in the district boycotted the schools. Harvey Black testified that the school board met with leaders of the concerned citizens on one occasion and that he visited the schools and informally met with students. Superintendent Cobb testified that he sent notices advertising openings to all of Mississippi's state-supported universities with education programs, including predominantly black institutions. Cobb and Black were unable to identify or produce any documentary evidence of any other steps taken by school authorities.
When Superintendent Cobb was deposed in August, 1985, only one black student was enrolled in the gifted and talented program. In his deposition he testified that he was told that parents of other eligible black students would not allow the necessary screening. Yet, enrollment in the program was one of the concerns raised by black citizens and students in 1986. He also testified that no black students were enrolled in chemistry or physics courses. The district enrolls a disproportionate number of black students in special education classes for the educable mentally retarded (EMR). In 1979, 81 of 617 black students or 13% were assigned to EMR classes and 13 of 991 white students or 1% were assigned to EMR classes. In 1980, 44 of 607 (7%) black students and 13 of 960 (1%) white students were assigned to EMR classes. In 1982, 28 of 618 (4%) black students and 5 of 947 (.5%) white students were assigned to EMR classes. In 1984, 24 of 626 (3.8%) black students and 5 of 976 (.5%) white students were enrolled in EMR classes.

III. Unitary Status
A previously segregated dual school system does not automatically become desegregated upon the adoption and implementation of a constitutionally acceptable plan. Ross v. Houston Independent School District, 699 F.2d 218, 225 (5th Cir.1983) (citing United States v. Texas Education Agency, 647 F.2d 504, 508 (5th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982)); Pitts v. Freeman, 755 F.2d 1423, 1426 (11th Cir. 1985). The CCSD argues that it became a unitary school system by the end of the 1977-78 school year and that Thomas is not entitled to relief under the Singleton provisions of the consent decree. Singleton "is rendered inapplicable only when `full compliance with the desegregation directives of this Court' is achieved." Thompson v. Madison County Board of Education, 496 F.2d 682, 687 (5th Cir.1974) (quoting McLaurin v. Columbia Municipal Separate School District, 478 F.2d 348, 352 (5th Cir.1973)). Singleton protection is afforded until the court adjudicates that the district has achieved unitary status. Cousin v. Board of Trustees of Houston Municipal Separate School District, 726 F.2d 262, 268 (5th Cir.1984) (Singleton rights "exist to remedy the inevitable inequities caused by the injunction [and] cease to exist when the court terminates the injunction"). The Eleventh Circuit explained the following distinction:
[A] unitary school system is one which has not operated segregated schools as proscribed by cases such as Swann [v. Charlotte-Mecklenburg Bd. of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 *312 L.Ed.2d 554 (1971)] and Green [v. County School Bd. of Education, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)] for a period of several years. A school system which has achieved unitary status is one which is not only unitary but has eliminated the vestiges of its prior discrimination and has been adjudicated as such through the proper judicial procedures.
Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1413 n. 12 (11th Cir.1985). A previously segregated school system is under "an affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Columbus Board of Education v. Penick, 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666, 677 (1979) (quoting Green v. New Kent County School Board, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716, 723 (1968)). See Ross v. Houston Independent School District, 699 F.2d at 225 ("continuing duty to eliminate the system-wide effects of earlier discrimination and to create a unitary system untainted by the past").
The CCSD must fully comply with the consent decree with regard to desegregation of student class assignments, employment of faculty and other personnel, student transportation, and extra-curricular activities. United States v. Lawrence County School District, 799 F.2d 1031, 1043 (5th Cir.1986) ("Vestiges of a racially discriminatory dual school system" may be found in each area). It is well settled that the defendant school district has the burden of proof of its unitary status:
[Public school officials] must demonstrate to the district court overseeing their desegregation efforts that "current segregation is in no way the result of [their] past segregative actions." Keyes v. School Dist. No. 1, 413 U.S. 189, 211 n. 17, 93 S.Ct. 2686, 2699 n. 17, 37 L.Ed.2d 548, 565 n. 17 (1973). The district court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." Green v. New Kent County School Bd., 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716, 724 (1968)....
Ross, 699 F.2d at 225.
It is undisputed that the number of black teachers has decreased. Superintendent Cobb testified that recruitment of black applicants in such a rural area is difficult. For instance, a black applicant declined when offered a coaching position and a black English teacher resigned to work in another county for a higher salary. However, Harvey Black admitted that Chocktaw County's low tax base, rural environment, and noncompetitive salaries impede recruitment of all teaching applicants, black and white. The best evidence would have been the statistics on the number of vacancies and the number of black applicants for each vacancy in proportion to the number of blacks hired. No such evidence was offered by the CCSD.
The racial disparity in the special education classes and the accelerated classes has been substantial. Achievement grouping is permissible in an otherwise unitary system
if the school district can demonstrate that its assignment method is not based on the present results of past segregation or will remedy such results through better educational opportunities.
Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1414 (11th Cir.1985) (quoting McNeal v. Tate County School District, 508 F.2d 1017, 1020 (5th Cir.1975)). The CCSD offered no evidence of movement of black students in the lower achievement classes to higher sections since 1984 and no evidence of its assignment method. See United States v. Gadsden County School District, 572 F.2d 1049, 1052 (5th Cir.1978). In any event, the CCSD has not shown that it is fully integrated in the other areas of faculty, staff, extra-curricular activities, and transportation. United States v. Texas Education Agency, 647 F.2d at 507 (school district must be fully integrated in all areas in order to achieve unitary status). Superintendent Cobb's testimony that there is "racial mixing" in all areas of the school system, unsupported by any statistics or documentary *313 evidence, is insufficient to establish that the vestiges of the dual system have been eliminated "root and branch." The court finds that the CCSD has not met its burden of proof and thus cannot be declared fully unitary.

IV. Thomas' Singleton Claims
Since the CCSD has not achieved unitary status, Singleton controls the outcome and relief of Thomas' claims. Thomas has the burden of proof that he is entitled to Singleton protection. Lee v. Pickens County School System, 563 F.2d 143, 145 (5th Cir.1977). Thomas alleges that he was demoted from principal of an all-black high school to assistant principal of the consolidated Ackerman High School and passed over for the principalship three times in violation of his Singleton rights. The Singleton provisions read in pertinent part:
If there is to be a reduction in the number of principals, teachers, teacheraides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition, if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.
"Demotion" as used above includes any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously....
Thomas claims that he was not selected for demotion on the basis of objective non-racial criteria and that he was not given priority consideration for subsequent vacancies for the principalship.
The court finds that Thomas, although named a co-principal, was demoted to assistant principal, see Lee v. Macon County Board of Education, 453 F.2d 1104, 1109 (5th Cir.1971) ("[t]he real gist of demotion is a reduction in responsibility"), and that his demotion was related to court-ordered desegregation involving a reduction in the number of high school principals. Cousin v. Board of Trustees of Houston Municipal Separate School District, 726 F.2d at 268 ("Singleton rights arise only in the context of court-ordered desegregation"); Pegues v. Morehouse Parish School Board, 706 F.2d 735, 739 (5th Cir.1983) (reduction of "positions substantially similar to that held by the displaced employee"). See Lee v. Pickens County School System, 563 F.2d at 145 n. 1 (court should "look solely to the number of principals involved instead of the total number of personnel involved"). It is undisputed that Thomas was not selected for demotion on the basis of previously promulgated objective criteria. In addition, as a displaced employee within the purview of Singleton, Thomas had the right of first refusal, if qualified, for the principalship vacancies at Ackerman High School in 1972, 1978, and 1983. Hardy v. Porter, 546 F.2d 1165, 1167 (5th Cir.1977).
Singleton requires the school board to give preference or recall rights to members of the "pre-desegregation order population" of principals as follows:
The school board cannot go outside the population to appoint future principals of another race, color, or national origin, even if it stays within its own school system, until that population is exhausted or until the members of the population voluntarily opt out, or unless a member of the population is unqualified to serve.
Lee v. Macon County Board of Education, 453 F.2d at 1110. To do so, the CCSD would have had to establish Thomas' lack of qualifications "by means of objective and absolute criteria." Id. The displaced employee need only be "minimally qualified" in order to acquire Singleton recall rights. Moore v. Tangipahoa Parish School Board, 594 F.2d 489, 496 (5th *314 Cir.1979). Singleton implicitly provides a per se presumption that the applicant was not unqualified when he held a similar position in the school district prior to the desegregation order. Thomas, a former high school principal in the defendant school district, is presumed to be qualified for the principalship openings, and the CCSD failed to establish
quite clearly why one who was qualified prior to a desegregation order suddenly became unqualified after the order.
Lee v. Macon County Board of Education, 453 F.2d at 1110.
Superintendent Cobb and Black testified that the principals hired in 1972, 1978, and 1983 were more qualified than Thomas. The court does not desire to substitute its judgment for that of the school board and does not find that Thomas was the most qualified applicant on all three occasions. However, the school board agreed in the consent decree not to make hiring decisions by comparing the applicants' qualifications. Shirley McGaugh, a school board member, testified that it was doubtful that she was aware of the Singleton provisions when she became a board member. The CCSD violated Thomas' Singleton rights in choosing persons of another race on the ground that they were more qualified than Thomas. The Fifth Circuit has held:
It is not enough to assert that a principal hired from without the pre-order population is "more" qualified than a member of the population of demoted principals or teachers....
Lee v. Macon County Board of Education, 453 F.2d at 1110. There is no evidence that the superintendents or the school board even considered Thomas' Singleton rights at any time. The county school board was satisfied with Thomas' qualifications as principal of the segregated black high school but, after agreeing to desegregate, was unwilling when vacancies arose on three occasions over an 18-year period to appoint him as principal of the new desegregated high school.
The Singleton criteria may be satisfied by an offer of a comparable position to the displaced employee. Bassett v. Atlanta Independent School District, 485 F.2d 1268, 1271 (5th Cir.1973) (citing Lee v. Macon County Board of Education, 453 F.2d 1104). The court notes that, in light of Thomas' repeated applications and known desire to serve as principal, the position of assistant superintendent may have been created merely to pacify Thomas. It is undisputed that the position was offered to Thomas under pressure without the usual hiring process of advertising, accepting applications, and conducting interviews. Even though Thomas, as assistant superintendent, is touted to be the second highest administrator in the school district, his salary is less than that paid to the principal of Ackerman High School and his responsibilities are relegated outside the normal processes and the overall academic function of the school system. Thomas' current position is related "to the desegregation process and to the inequities which Singleton is intended to remedy." Hardy v. Porter, 546 F.2d at 1167-68. The court finds that Thomas' current position is not comparable to the high school principalship and that Thomas has not been afforded the preferential treatment to which he is entitled under Singleton. The court notes that Thomas' salary as assistant superintendent has increased and was within $800.00 of the principal's salary during the 1988-89 school year. However, the court in Lee v. Macon County Board of Education stated that the rationale of desegregation would be undermined if the school board merely offered "higher salaries for substantially less responsible work to demoted employees." 453 F.2d at 1110. Even equal monetary remuneration does not compensate for reduced responsibility. Bassett, 485 F.2d at 1271 (citing Lee v. Macon County Board of Education, 456 F.2d 1371, 1372 (5th Cir.1972) (plaintiff whose salary was not diminished was entitled to reinstatement)).
The CCSD asserts that Thomas' claims are barred under the doctrine of laches. Laches is an equitable doctrine that prevents parties from seeking equitable relief. Clark v. Amoco Production Co., 794 F.2d 967, 971 (5th Cir.1986). Sin- *315 gleton rights are equitable remedies appurtenant to a desegregation injunction. Cousin, 726 F.2d 262, 268-70 (5th Cir. 1984). Therefore, laches is applicable to Singleton claims. Pegues v. Morehouse Parish School Board, 632 F.2d 1279 (5th Cir.1980), cert. denied, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 844 (1981) (Pegues I). Laches operates upon a showing of inexcusable delay resulting in an "actual prejudicial change." Id. at 1283 n. 5 ("disadvantage in asserting and establishing a claimed right or defense, or other damage caused by detrimental reliance on the plaintiff's conduct").
Three superintendents were elected during the relevant time period from 1970 to 1983. Mr. Perrigin served as superintendent during the reorganization in 1970 and in 1972 when Thomas was first passed over for promotion. Superintendent Perrigin died before the commencement of Thomas' action in August, 1984. This action was filed fourteen years after Thomas' demotion, twelve years after the first principalship vacancy was filled, and one year after the last turnover. Thomas testified that he wanted to be principal of Ackerman High School and thought his "chances [of promotion] would improve." Since Singleton imposed an ongoing duty upon the school board to fill subsequent vacancies with qualified displaced personnel and there was a different superintendent at the time of each vacancy in dispute, Thomas had a reasonable expectation that he would eventually be selected until his reassignment in 1983. The court finds that Thomas' delay in bringing an action for the 1970 and 1972 Singleton claims was excusable and, therefore, does not constitute laches.
Even if Thomas' delay were inexcusable, the CCSD would be prejudiced only as to the statutory civil rights claims as a result of Superintendent Perrigin's death. Unlike relief under Title VII, § 1981, or § 1983, Singleton protection is afforded without proof of discriminatory intent. Lujan v. Franklin County Board of Education, 766 F.2d 917, 923-24 (6th Cir.1985). The court in Lujan stated:

Singleton rights are not mere remedies for victims of discrimination. Rather, they accord a preference to a certain class of persons: those who were displaced, not by discrimination, but by the historical forces of desegregation.
Id. at 924. The school board is responsible for implementing the Singleton standards:
Both the requirement that displacements be [effected] only in accordance with written, objective criteria and the requirement that displaced personnel be given a right of first refusal of subsequent vacancies are standards of conduct imposed upon school boards under court order.
Hardy v. Porter, 546 F.2d at 1168. The school board was required to develop the criteria for demotions to be retained by the school district. Since the nonexistence of written criteria at the time of Thomas' demotion is undisputed, the CCSD's only defense to the Singleton claims is to establish that Thomas was not demoted or was not qualified for the vacancies. See Lee v. Macon County Board of Education, 453 F.2d at 1113 ("if the facts of a case fall within the ambit of Singleton, the board is given no authority to explain its failure to reinstate"). The school board was obligated to offer Thomas the principalship before resorting to normal hiring procedures. Since the school board had access to all employment records, including Thomas' records, Thomas' delay did not prejudice the CCSD as to the Singleton claims. See Lee v. Macon County Board of Education, 453 F.2d at 1108-09 n. 6 (although the superintendent had died, the "school board should have in its possession some records regarding positions available at particular times or positions offered and rejected"). Thomas' "prolonged inaction and the intervening change in circumstances in the school system" do not justify denial of recovery. Pegues v. Morehouse Parish School District, 632 F.2d at 1283.

V. Thomas' Claims Under Title VII, § 1981, and § 1983
Thomas alleges that the CCSD's repeated refusals to reinstate or promote him to the principalship of Ackerman High School were motivated by racial discrimination *316 in violation of 42 U.S.C. §§ 1981, 1983, and 2000e, et seq. (Title VII). Having determined that Thomas' Singleton claims are dispositive, the court need not address the issue of discriminatory intent. See Cousin v. Board of Trustees of Houston Municipal Separate School District, 726 F.2d at 268 (when the school district achieves unitary status, "principles of contract law and constitutional or statutory imperatives govern the case"). Accordingly, all remaining issues such as the admissibility of an excerpt of Freddie Joe King's deposition and the CCSD's post-trial motion to amend to assert limitations periods as to the remaining statutory claims, are moot.

VI. Remedies
Thomas seeks the equitable remedies of back pay from the time of his demotion in 1970, plus fringe benefits of housing and utilities allowances, and immediate reinstatement to the principalship of Ackerman High School which is presently filled by McLeod. The Fifth Circuit has defined Singleton rights as follows:
They are aspects of equitable remedies, designed by this court under its general equitable power to fashion relief for constitutional violations (in this case, maintenance of a segregated, dual school system) in accordance with principles of fairness and with a minimum of hardship to persons affected by large scale, court-ordered social change.
Hardy v. Porter, 546 F.2d at 1168. Since immediate reinstatement would involve bumping and would be disruptive, the court finds that such relief would not be consonant with equity. However, since the school district has not achieved unitary status, Thomas' Singleton right to reinstatement is enforceable.
Under Singleton, a demoted principal, whose objective qualifications do not diminish in an absolute sense after issuance of the desegregation order and his demotion,

must be given [an] opportunity to assume any new principalships or any positions tantamount to his lost principalship prior to the offering of the position to new applicants of another race.
Lee v. Macon County Board of Education, 453 F.2d at 1111. In a case involving both demotions and non-renewal of black principals and teachers, the Fifth Circuit held
that if the District Court found on remand that black educators had been discriminated against under the Jefferson County[1] and Singleton III standards, it "must order their reinstatement with appropriate back pay and other equitable relief."
Adams v. Rankin County Board of Education, 485 F.2d 324, 327 (5th Cir.1973), quoted in Moore v. Tangipahoa Parish School Board, 594 F.2d at 495. Under Singleton, Thomas is absolutely entitled to the principalship at either high school in the district. See Lujan v. Franklin County Board of Education, 766 F.2d 917, 923-224 (6th Cir.1985) ("Under Singleton, Lujan who was demoted in 1966 would be absolutely entitled to the head coaching position which opened in 1979"); Lee v. Macon County Board of Education, 453 F.2d at 1112 (demoted principal "is entitled to the principalship of Avalon or to the principalship of another school in the.... system). The court finds that the CCSD should be ordered to offer Thomas the first principalship vacancy occurring either at Ackerman High School or Weir High School if Thomas has not yet retired at that time.
As an integral element of the equitable remedy of reinstatement, back wages diminished by Thomas' interim earnings are recoverable. See McLaurin v. Columbia Municipal Separate School District, 478 F.2d at 354 (quoting Harkless v. Sweeny Independent School District, 427 F.2d 319, 324 (5th Cir.1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971)). Thomas seeks back pay in the amount of $40,508.91 for the period of the school years 1970-71 through 1984-85. Since his demotion was in violation of Singleton, *317 Thomas is entitled to back pay computed from the time of his demotion in 1970. See Moore v. Tangipahoa Parish School Board, 594 F.2d at 497. Thomas may recover back pay through 1984-85 when his salary was substantially less than the principal's salary. Thomas testified that he computed the difference between his salary and the principal's salary at eight (8) percent interest. The court finds that Thomas should be awarded the uncontroverted amount of $40,508.91 in back pay.
Thomas also seeks recovery of the free housing and utilities allowances provided principals of Ackerman High School. During the relevant period, Thomas paid an average of $190.00 per month for utilities and is entitled to $15,960.00 for the period of 1970-71 through 1977-78. Thomas testified that his average monthly housing payment was $354.00. The CCSD argues that since Thomas' average monthly housing expense reflects Thomas' monthly mortgage payments, an award of $63,720.00 would pay for his home ownership and is thus unreasonable. The court finds that Thomas is entitled to the fair rental market value of the house occupied by the principal of the Ackerman High School from the school year 1970-71 to 1985 to be determined by the parties.
An order will issue accordingly.
NOTES
[1] United States v. Jefferson County Board of Education, 380 F.2d 385, 394 (5th Cir.) (en banc), cert. denied, sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).